# In the
# United States Court of Appeals
## For the Seventh Circuit

_____

No. 03-4041

JIM BENSMAN, MARK DONHAM and
HEARTWOOD, INCORPORATED,

Plaintiffs-Appellants,

v.

UNITED STATES FOREST SERVICE
and RANDY MOORE,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Wisconsin.
No. 01 C 1062—**J.P. Stadtmueller**, Judge.

_____

ARGUED SEPTEMBER 13, 2004—DECIDED JUNE 2, 2005

_____

Before BAUER, RIPPLE and EVANS, Circuit Judges.

RIPPLE, Circuit Judge.  Through its employees, Mark Donham and Jim Bensman, Heartwood, Inc., an Indiana nonprofit concerned with preserving the national forests, commented on several projects of the United States Forest Service ("Forest Service" or "the Service"). When notified of the decision of the Service with respect to these projects, it sought, through the same employees, to file an appeal in

each of those matters. In filing its appeals, Heartwood relied upon the Service's statement as to the due date for the filings. That statement was wrong; the appeals were a day late, and the Service therefore refused to consider them.

Invoking the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-706, Heartwood then filed this action in the district court. It sought declaratory and injunctive relief to require that the Service consider its appeals. The district court dismissed the action; it held that Mr. Donham lacked standing to assert one claim and that neither he nor Mr. Bensman could assert equitable tolling or equitable estoppel with respect to the other. For the reasons set forth in this opinion, we affirm the judgment of the district court.

# I
# BACKGROUND

## A. Facts

We shall limit this rendition to those facts pertinent to the issues before us. The Forest Service invited public comment with respect to certain project decisions for the Mark Twain National Forest in Missouri (the "Chadwick Trails project") and the Hiawatha and Ottawa National Forests in Michigan (the "Pole Lake project" and "Plantation Lakes project," respectively). Heartwood, through its employees, Mr. Bensman and Mr. Donham, submitted comments to the Service about the advisability of certain proposed actions with respect to each of these projects.

When the Forest Service made its initial decision with respect to each project, it complied with statutory and regulatory requirements by mailing to interested parties information about how to appeal the Service's determinations. Because Mr. Donham and Mr. Bensman had participated in the initial comment period, they received this notification. Re-

lying on 36 C.F.R. § 215, the cover letters sent by the Service noted that appeals had to be lodged within 45 days of the decisions' publications and also noted the precise date when appeals were due. In each case, the date was incorrect; the 45-day window for appeals under 36 C.F.R. §§ 215.9 and 215.13 (2001)[1] actually closed the day before the given date.

Mr. Donham and Mr. Bensman filed appeals of decisions within their areas of responsibility (the Pole Lake/ Plantation Lakes projects, and Chadwick Trails project, respectively) on the dates specified by the Service's notification. The Service nevertheless dismissed their appeals because their submissions were late.

## B. District Court Proceedings

After the Service refused to consider the appeals, Heartwood, along with Mr. Donham and Mr. Bensman, filed this action. Invoking the APA, they sought declaratory and injunctive relief to require that the Service consider their appeals.

The plaintiffs took the position that, because they had relied on the Service-provided due dates, the 45-day appeal period was equitably tolled, and the Forest Service was estopped from dismissing their appeals. They requested that the district court require the Service to stay the three projects until it considered their appeals. In reply, the Service asserted that the district court lacked subject matter

---

[1] The decisions and appeals in the three projects, Chadwick Trails, Pole Lake and Plantation Lakes, spanned from January 2000 to August 2001. Although Service regulations changed after 2002, the applicable regulations remained the same during this time period. For ease of reference, we cite to the 2001 Code of Federal Regulations when considering the regulations in force at the times in question.

jurisdiction over the action because the plaintiffs did not have standing to seek such redress in a federal court. The Service further submitted that the plaintiffs were not entitled to equitable tolling or equitable estoppel.

The district court first turned to Mr. Bensman's appeal concerning the Chadwick Trails project. The district court held that Mr. Bensman had standing because he had asserted a concrete injury in not having received the information that he had sought. Turning to Mr. Donham's appeal, the district court held that Mr. Donham could not assert such an informational injury because he did not identify any concrete and particularized injury.

Because the district court had determined that Mr. Bensman had standing to pursue the action with respect to his administrative appeal, the district court next considered whether equitable tolling and equitable estoppel rendered timely his administrative appeals. With respect to the equitable tolling claim, the district court concluded that, with due diligence, Mr. Bensman could have filed the appeals on time; therefore, he could not rely on equitable tolling. With respect to equitable estoppel, the court found no evidence of deliberate misconduct on the part of the Forest Service and held that equitable estoppel was inapplicable. The district court therefore dismissed the action. This appeal followed.

## II

## DISCUSSION

### A. Standing

Before we may address the merits, we must consider the "threshold jurisdictional question" of whether Mr. Bensman

and Mr. Donham, and Heartwood,[2] have standing to maintain this action. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). "Standing to sue is part of the common understanding of what it takes to make a justiciable case," *id.* (citing *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)), and "[f]or a court to pronounce upon the meaning . . . of a state or federal law when it has no jurisdiction to do so is, by very definition, for a court to act ultra vires," *id.* at 101-02. The parties invoking federal jurisdiction, here Mr. Bensman, Mr. Donham and Heartwood, bear the burden of establishing the requisite standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).

---

[2] Heartwood predicates its claim to standing on both representational and organizational injury. *See Freedom from Religion Found., Inc. v. Zielke*, 845 F.2d 1463, 1469 (7th Cir. 1988) (noting that an organization may have standing based on injury to itself or, absent such injury, as a representative of members). Heartwood claims standing as an organization, *Warth v. Seldin*, 422 U.S. 490, 511 (1975), by asserting an informational, procedural or participation injury to itself. In this respect, it argues that, as is the case with all corporations, it can act only through its agents and that the dismissals of the appeals brought on its behalf by its agents, Mr. Bensman and Mr. Donham, constitute direct injury to itself.

Heartwood also claims that it can assert derivatively the injury suffered by its employees. An organization can assert standing on this basis when its members can sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested require the participation of individual members in the lawsuit. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000); *Hunt v. Washington Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977). Heartwood's organizational standing claim thus shares a common assertion of informational, procedural or participation injury with Mr. Bensman and Mr. Donham. For ease of reference, therefore, we address only the standing of Mr. Bensman and Mr. Donham.

"The irreducible constitutional minimum of standing contains three requirements." *Steel Co.*, 523 U.S. at 102 (internal quotation omitted). To maintain an action in a federal court, Mr. Bensman, Mr. Donham and Heartwood must demonstrate (1) an injury in fact, which is (a) concrete and particularized and (b) actual or imminent; (2) that is traceable to the Forest Service's refusal to hear their appeal; and (3) that is likely to be redressed by a favorable decision from this court. *Id.* at 103; *Lujan*, 504 U.S. at 560-61. Before we apply the analytical formula to the case at hand, it is essential that we pause a moment and focus on the precise nature of the claim asserted by these plaintiffs. The plaintiffs' claim alleges a violation of the APA. The plaintiffs believe that the Forest Service arbitrarily and capriciously dismissed their appeals and therefore deprived them of their rights under the Appeals Reform Act ("ARA"), 16 U.S.C. § 1612 note,[3] to

---

[3]  16 U.S.C. § 1612 note provides:

> (a) In general.—In accordance with this section, the Secretary of Agriculture, acting through the Chief of the Forest Service, shall establish a notice and comment process for proposed actions of the Forest Service concerning projects and activities implementing land and resource management plans developed under the Forest and Rangeland Renewable Resources Planning Act of 1974 (16 U.S.C. §§ 1601 et seq.) and shall modify the procedure for appeals of decisions concerning such projects.
>
> (b) Notice and comment.—
>
> > (1) Notice.—Prior to proposing an action referred to in subsection (a), the Secretary shall give notice of the proposed action, and the availability of the action for public comment by—

(continued...)

---

(...continued)

      (A) promptly mailing notice about the proposed action to any person who has requested it in writing, and to persons who are known to have participated in the decisionmaking process; and,

      (B)(i) in the case of an action taken by the Chief of the Forest Service, publishing notice of action in the Federal Register; or

      (ii) in the case of any other action referred to in subsection (a), publishing notice of the action in a newspaper of general circulation that has previously been identified in the Federal Register as the newspaper in which notice under this paragraph may be published.

    (2) Comment.—The Secretary shall accept comments on the proposed action within 30 days after publication of the notice in accordance with paragraph (1).

(c) Right to appeal.—Not later than 45 days after the date of issuance of a decision of the Forest Service concerning actions referred to in subsection (a), a person who was involved in the public comment process under subsection (b) through submission of written or oral comments or by otherwise notifying the Forest Service of their interest in the proposed action may file an appeal.

(d) Disposition of an appeal.—

    (1) Informal disposition.—

      (A) In general.—Subject to subparagraph (B), a designated employee of the Forest Service shall offer to meet with each individual who files an appeal in accordance with subsection (c) and attempt to dispose of the appeal.

(continued...)

(...continued)

(B) Time and location of the meeting.—Each meeting in accordance with subparagraph (A) shall take place—

(i) not later than 15 days after the closing date for filing an appeal; and

(ii) at a location designated by the Chief of the Forest Service that is in the vicinity of the lands affected by the decision.

(2) Formal review.—If the appeal is not disposed of in accordance with paragraph (1), an appeals review officer designated by the Chief of the Forest Service shall review the appeal and recommend in writing, to the official responsible for deciding the appeal, the appropriate disposition of the appeal. The official responsible for deciding the appeal shall then decide the appeal. The appeals review officer shall be a line officer at least at the level of the agency official who made the initial decision on the project or activity that is under appeal, who has not participated in the initial decision and will not be responsible for implementation of the initial decision after the appeal is decided.

(3) Time for disposition.—Disposition of appeals under this subsection shall be completed not later than 30 days after the closing date for filing of an appeal, provided that the Forest Service may extend the closing date by an additional 15 days.

(4) If the Secretary fails to decide the appeal within the 45-day period, the decision on which the appeal is based shall be deemed to be a final agency action for the purpose of chapter 7 of title 5, United States Code.

(e) Stay.—Unless the Chief of the Forest Service determines

(continued...)

file an appeal from the Service's initial determination and to have that appeal considered according to the terms of that statute. In essence, Mr. Bensman and Mr. Donham challenge the Forest Service's refusal to consider their appeals; in their view, this refusal denied them rights that they believe Congress afforded them under the ARA as notice and comment participants. The injury that they assert is the Service's refusal to hear those appeals, an injury, they further submit, that the district court can remedy through the requested relief.[4]

---

(...continued)

that an emergency situation exists with respect to a decision of the Forest Service, implementation of the decision shall be stayed during the period beginning on the date of the decision—

(1) for 45 days, if an appeal is not filed, or

(2) for an additional 15 days after the date of the disposition of an appeal under this section, if the agency action is deemed final under subsection (d)(4).

[4] Mr. Bensman's submission to the district court grounded his injury claim in the belief that the dismissal of his appeal prevented him from receiving certain information. Essentially, he asserted that the Forest Service gave an inadequate response to his submissions in the notice and comment process; that in not considering his appeal the Forest Service refused to correct this inadequate analysis; and that he required this information to "fully understand, and comment upon, the impacts from the [Chadwick Trails] project." R.38, Ex.2 ¶ 6. The district court accepted that Mr. Bensman "has been harmed by the dismissal of his administrative appeal because he has not received the information he seeks," and because the Forest Service did "not appear to contest this proposed fact" the district court determined that Mr. Bensman had standing to contest the dismissal of

(continued...)

The only standing question presented in this appeal is whether the plaintiffs have suffered an injury in fact sufficient to establish constitutional standing that will allow them to maintain this action in federal court. They assert that the Forest Service injured them by denying them procedural rights granted by the ARA. In their view, they have a right under the ARA to participate in the administrative appeals process and to receive information regarding the disposition of their appeals. The denial of this opportunity constitutes, they submit, a sufficiently concrete injury for standing purposes. Mr. Bensman and Mr. Donham further contend that they have concrete interests in land affected by the Service projects. In their view, the Forest Service's dismissal of their appeals injured those interests in a manner sufficient to give them standing to challenge the Service's decision. We shall consider each theory of injury in turn.

### 1.

The plaintiffs assert what might be called generically a "procedural injury."[5] This claimed right is grounded solely

---

[4] (...continued)
his Chadwick Trails appeal. R.58 at 8.

Although the Forest Service does not challenge Mr. Bensman's standing here, we have the independent obligation "to satisfy ourselves that this jurisdictional requirement is met." *Rhodes v. Johnson*, 153 F.3d 785, 787 (7th Cir. 1998). Standing is a constitutional prerequisite for an Article III court to hear this appeal, and we must be satisfied that all of the plaintiffs demonstrate the necessary elements.

[5] *See* Appellants' Br. at 20 ("Heartwood's 'right to appeal' has been taken from it due to no fault of their members . . . . The fact
(continued...)

in the ARA requirement that the Service afford appeal rights to individuals who have participated in the comment period for the project. They simply ask that the Service comply with the ARA.[6] The right that they assert is the very definition of a procedural right: "the right to have the Executive observe procedures mandated by law." *Hodges v. Abraham*, 300 F.3d 432, 444 (4th Cir. 2002).

The plaintiffs are certainly within the class of persons who "may file an appeal" under the ARA because they participated in the notice and comment process. 16 U.S.C. § 1612 note (c). It equally is certain that, in dismissing their appeals, the Forest Service deprived them of this procedural right to be heard during the appellate phase of the Service's consideration of its decision in each project. The Service submits, nevertheless, that the alleged injury is insufficient to satisfy the constitutional prerequisite for standing. It points out that, in *Lujan,* the Supreme Court determined that plaintiffs could not fulfill the constitutional standing requirement simply by asserting a procedural right. In *Lujan,* the plaintiffs relied upon a provision of the Endangered Species

---

[5] (...continued)
that Donham and Heartwood are not able to raise their substantive claims on behalf of Heartwood . . . is the actual injury.").

[6] Notably, with respect to this contention, the plaintiffs do not contend, for instance, that the Service's decision deprived them of the use of their land. In such a scenario, the plaintiffs' challenge to the agency action would not rely solely on whether the Service complied with the ARA. In the argument we are now evaluating in the text, the plaintiffs' position relies solely on the ARA's procedural requirement that those who have commented on the Service's proposed action have a right to participate in the appellate stage of the Service's consideration of the proposed action.

Act ("ESA"), 16 U.S.C. § 1540(g), that granted a "procedural right" to "any person" to challenge in federal court the Secretary of the Interior's failure to follow the ESA's consultative procedures. *Lujan*, 504 U.S. at 571-72. The plaintiffs sought to require the Secretary to engage in intra-agency consultation during his decision-making process. The Supreme Court went on to note that this claimed "procedural right" gave *any* individual the right to maintain an action in federal court to assert what amounted to a generalized grievance about the manner in which the Secretary was conducting his office. The relief sought, an order compelling the Secretary to observe the statutorily mandated decision-making process, impacted on no concrete, individualized interest of the plaintiffs; their grievance was shared with everyone else. It was in no way specific to them. To underline its point, the Supreme Court set forth, at some length, its earlier cases in which a citizen had sought federal judicial relief against a government official who, in the view of the plaintiff, had not conformed his conduct to a legal norm, but in which the plaintiff had suffered no injury that differentiated him from anyone else in the American population.[7]

---

[7]  For instance, the Court relied upon its decision in *Fairchild v. Hughes*, 258 U.S. 126 (1922), in which it had denied standing to an individual, suing as a taxpayer and member of the American Constitutional League, who sought to challenge the ratification process for the Nineteenth Amendment. It also relied upon *Massachusetts v. Mellon*, 262 U.S. 447 (1923), in which it had denied standing to a taxpayer who wanted to challenge certain federal expenditures. The Court further noted that this same line of reasoning had been at the core of the Court's decisions in many other cases in which an individual had sought to rectify govern-mental action despite the fact that the plaintiff had suffered no

(continued...)

The situation before us today is not entirely congruent with the situation before the Supreme Court in *Lujan*. Here, the plaintiffs claim that a federal statute confers on them the right to participate in an administrative appeal process because they had submitted comments at an earlier stage in the decision-making process. They claim that the defendants arbitrarily and capriciously have denied them this procedural right, and they ask that the district court grant them relief that will ensure that they can exercise that right.

Unlike the situation in *Lujan*, the present plaintiffs are seeking to vindicate their own statutory right to participate in an administrative process. In that sense, the asserted right might be characterized as personal to them. They also have fulfilled the prerequisite of having participated in the comment stage of the Service's consideration of the proposed action and now wish to participate in the Service's appellate consideration of the same action, a right specifically accorded them by the ARA. In this action they want to correct the Service's deprivation of that personal right, not rectify, as in *Lujan*, a government misstep that affects them no more than it affects the rights of all other citizens.

Despite these factual differences, we believe that the present standing claim is governed by the same principles as the ones that formed the bedrock of the Supreme Court's

---

[7] (...continued)
specific injury, but simply had shared with all others the generalized injury of having government not conform its actions to the law. *See, e.g.*, *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208 (1974) (no citizen-taxpayer standing to allege a violation of the Incompatibility Clause); *United States v. Richardson*, 418 U.S. 166 (1974) (no taxpayer standing to challenge an alleged violation of the Accounts Clause); *Ex parte Levitt*, 302 U.S. 633 (1937) (no citizen standing to challenge the appointment of a Justice under the Ineligibility Clause).

decision in that case. The Supreme Court made clear in *Lujan* that, unless the denial of a procedural right endangered a separate substantive right of the plaintiff, a plaintiff may not invoke the federal judicial power to vindicate the denial of that procedural right: "This is not a case where plaintiffs are seeking to enforce a procedural requirement the disregard of which could impair a separate concrete interest of theirs." *Lujan*, 504 U.S. at 572. Consequently, we, along with other circuits, have acknowledged that the denial of a "procedural right, unconnected to a plaintiff's concrete harm, is not enough to convey standing." *Heartwood, Inc. v. United States Forest Serv.*, 230 F.3d 947, 952 (7th Cir. 2000) (citing *Lujan*, 504 U.S. at 571-72); *see also Rhodes v. Johnson*, 153 F.3d 785, 787 (7th Cir. 1998) (noting that *Lujan* "foreclosed standing based on some sort of 'procedural injury' "); *Animal Legal Def. Fund, Inc. v. Glickman*, 204 F.3d 229, 236 (D.C. Cir. 2000) ("But standing to raise a procedural injury requires that the procedural norm be one designed to protect some threatened concrete interest of the plaintiff . . . ." (internal quotation omitted)). Thus, under *Lujan*, the deprivation of a purely procedural right can be remedied by a federal court only when the individual who has been deprived of that right can demonstrate that deprivation of that right is related to another concrete injury. This principle does not mean that parties claiming a deprivation of procedural rights afforded by statute must establish that the agency would have reached a different conclusion had they been allowed to participate. The plaintiffs do not have to prove that their comments on appeal necessarily would alter the Forest Service's decision to proceed in the Chadwick Trails, Plantation Lakes and Pole Lake projects. *See Lujan*, 504 U.S. at 572. "All that is necessary is to show that the procedural step was connected to the substantive result." *Sugar Cane Growers Coop. of Florida v. Veneman*, 289 F.3d 89, 94-95 (D.C. Cir. 2002). *Lujan* requires the plaintiffs to demonstrate that the deprivation of their procedural rights

affects some concrete interest, such as their use and enjoy-
ment of the land. For example, "one living adjacent to the
site for proposed construction of a federally licensed dam
has standing to challenge the licensing agency's failure to
prepare an environmental impact statement," but there is no
"standing for persons who have no concrete interests
affected—persons who live (and propose to live) at the other
end of the country from the dam," *Lujan*, 504 U.S. at 572 n.7;
*see also Fund Democracy, LLC v. SEC*, 278 F.3d 21, 27 (D.C.
Cir. 2002) ("A party has standing to challenge an agency's
failure to abide by a procedural requirement only if the
government act performed without the procedure in
question will cause a distinct risk to a particularized interest
of the plaintiff.").

In short, unlike the procedural lapse in *Lujan*, the proce-
dural lapse in this case can be said to be personal to the
plaintiffs. Yet, unless the plaintiffs can show that the depri-
vation of this procedural right somehow is related to a dis-
crete, substantive injury for which they may seek redress in
federal court, they have no standing to seek redress of the
procedural injury itself. The plaintiffs therefore must
establish that some concrete interest has been affected by the
Forest Service's dismissal of their appeals. We turn now to
an examination of the various theories by which the plain-
tiffs have attempted to carry this burden.

### 2.

The plaintiffs submit that the ARA confers upon them a
right to have their voices heard through participation in the
decision-making process. Under this theory, the ARA-
granted right to participate in Forest Service decision-mak-
ing is a concrete interest, and the Service's decision to dis-
miss their appeals injures their right to participate in the
process.

We cannot accept this argument. The right guaranteed by the ARA is, at bottom, simply a right to participate in agency deliberations. At least after *Lujan*, "[p]articipation in agency proceedings is alone insufficient to satisfy judicial standing requirements." *Fund Democracy*, 278 F.3d at 27. "Because agencies are not constrained by Article III, they may permit persons to intervene in the agency proceedings who would not have standing to seek judicial review of the agency action." *Id. Lujan* and the cases that have followed it reason that the right to participate in the proceedings of the agency does not give one the right to seek redress for the deprivation of that right in federal court when one does not have a sufficiently differentiated concrete interest in the agency proceedings to seek review of the agency's substantive decision in federal court.

In this case, the right to an administrative appeal after participating in the initial agency comment period is created not simply by a regulation of the agency but by the statute itself. Nevertheless, the right granted by the ARA is, standing alone, a procedural right. Our colleagues on the Court of Appeals for the District of Columbia Circuit have faced squarely this precise issue and have determined that a statutory right similar to the ARA is insufficient to support standing. In *Fund Democracy*, 278 F.3d 21, an organization asserted standing as an "interested person" within the meaning of 15 U.S.C. § 80a-2(a)(19),[8] and as such claimed a right to redress in federal court when it was denied an opportunity to be heard along with other "interested persons." The District of Columbia Circuit assumed that the organization did qualify as an interested person, but held that the organization lacked standing in federal court to vindicate this right to be heard:

---

[8] The complete text of this statute is set forth at *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 23 n.1 (D.C. Cir. 2002).

> Fund Democracy suggests that Congress specifically intended to grant to all "interested persons" a right to a hearing before the SEC and that the denial of this right therefore confers standing. . . . Even assuming that Congress intended to grant a right to a hearing to all interested persons and that Fund Democracy is among those persons, the deprivation of that right does not alone confer Article III standing. The grant of a procedural right cannot serve as the basis for Article III standing unless "the procedures in question are designed to protect some threatened concrete interest of [petitioner's] that is the ultimate basis of his standing."

*Fund Democracy*, 278 F.3d at 27-28 (quoting *Lujan*, 504 U.S. at 573 n.8, and citing *Florida Audubon Soc'y v. Bentsen*, 94 F.3d 658, 664 (D.C. Cir. 1996)); *cf. Common Cause v. Fed. Election Comm'n*, 108 F.3d 413, 419 (D.C. Cir. 1997) ("[The statute in question] does not confer standing; it confers a right to sue upon parties who otherwise already have standing. As in *Lujan*, absent the ability to demonstrate a 'discrete injury' flowing from the alleged violation of [the Federal Election Campaign Act ('FECA')], Common Cause cannot establish standing merely by asserting that the [Federal Election Commission ('FEC')] failed to process its complaint in accordance with law. To hold otherwise would be to recognize a justiciable interest in having the Executive Branch act in a lawful manner."). *But see Fund Democracy*, 278 F.3d at 28 (Edwards, J., dissenting);[9] *Idaho*

---

[9] In his thoughtful dissenting opinion, Judge Edwards took the view that, when Congress creates such a particularized right to participate in agency appellate proceedings, the individual denied that right has a sufficient injury to permit him to seek redress of that right in federal court, even if he could not seek

(continued...)

*Conservation League v. Mumma*, 956 F.2d 1508, 1514 (9th Cir. 1992) (finding standing based on a violation of procedural requirements under the National Environmental Policy Act ("NEPA") because "NEPA is essentially a procedural statute," and "injury alleged to have occurred as a result of violating this procedural right confers standing" (citations omitted)).

The requirement that a party suffer concrete and particularized injury apart from the congressionally granted procedural process applies regardless of whether Mr. Bensman and Mr. Donham characterize their injury as "procedural" or as a violation of their "right to participate." The ARA grants Mr. Bensman and Mr. Donham a right to appeal to the Forest Service, but that procedural right does not automatically grant them standing to contest the Service's refusal to hear their appeal to an Article III court. Rather, they must show some concrete harm, apart from the denial of their right to participate, that constitutes "injury in fact" for standing purposes. A claimed participation injury cannot alone serve as proxy for the constitutionally required showing of concrete and particularized harm.

---

[9] (...continued)
review in the same forum from the agency's substantive determination because he lacks a sufficiently concrete injury from that vantage point. Judge Edwards notes that, if the individual does not have such redress to federal court, the agency can deny the procedural right with impunity. We cannot disagree with the Judge's conclusion as to the consequences of a denial of standing. Such a consequence is not, however, unknown in the law of standing. "The assumption that if [the plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing." *Schlesinger*, 418 U.S. at 227; *cf. Richardson*, 418 U.S. at 179.

**3.**

Mr. Bensman and Mr. Donham also submit that the Forest Service's decision to dismiss their appeals without consideration constitutes an "informational injury" that is sufficiently concrete and particularized to satisfy the "injury prong" of the standing inquiry. It is important to note that this asserted basis is separate from any interest that they may hold in the land affected by Forest Service decisions. It is grounded in, but apart from, their procedural rights granted by the ARA. Specifically, the plaintiffs allege that they have been injured by the Forest Service's denial of information to which they believe they have a statutory right.

The decisions of the Supreme Court and of some of our sister circuits provide ample authority for the view that such informational injury can constitute, in some contexts, sufficiently concrete harm to satisfy the constitutional standing inquiry. Most notably, in *Federal Election Commission v. Akins*, 524 U.S. 11 (1998), the Supreme Court recognized that an informational injury can be sufficiently concrete and particularized to support both Article III and prudential standing. In *Akins*, the Court held that a group of voters had standing to challenge the FEC's refusal to bring an enforcement action against a political committee, AIPAC. In that case, the voters had asserted that AIPAC failed to disclose information that the FECA[10] required be made public. With respect to the voters' Article III standing, the Court noted that their injury in fact stemmed from their

---

[10] The FECA requires qualified committees to file and maintain a variety of records and reports regarding donor, donor amounts, expenditures and disbursements. 2 U.S.C. §§ 432-434. The statutory provision further requires the FEC to make this information available to the public. *Id.* § 434(a)(11)(B).

failure to receive information that the statute specifically required be produced. *Akins*, 524 U.S. at 21. Moreover, noted the Court, FECA purported "to protect individuals such as respondents from the kind of harm they say they have suffered, i.e., failing to receive particular information about campaign-related activities." *Id.* at 22. The Court found it significant that FECA protected citizens from an "informational injury . . . directly related to voting, the most basic of political rights." *Id.* at 24-25. Given FECA's requirements and purposes, the Court held that the plaintiffs' lack of access to information constituted a sufficiently concrete and particularized injury to establish standing.

Informational deprivations also have been found sufficient to constitute Article III injuries in fact in causes of action brought under the Freedom of Information Act ("FOIA"),[11] and the Federal Advisory Committee Act ("FACA"),[12] *see,*

---

[11] *See, e.g., Pub. Citizen v. United States Dep't of Justice*, 491 U.S. 440, 449 (1989) ("Our decisions interpreting the Freedom of Information Act have never suggested that those requesting information under it need show more than that they sought and were denied specific agency records."); *see also McDonnell v. United States*, 4 F.3d 1227, 1238 (3d Cir. 1993) (citing *Richardson*, 418 U.S. at 204 (Stewart, J., dissenting) ("For example, the Freedom of Information Act . . . requires nothing more than a request and the denial of that request as a predicate to a suit in the district court.")).

[12] The FACA, 5 U.S.C. app. 2, provides that

the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection and copying at a single location in the offices of the advisory committee or the agency to which the advisory committee reports until the advisory committee ceases to exist.

(continued...)

*e.g.*, *Pub. Citizen*, 491 U.S. at 449; *Cummock v. Gore*, 180 F.3d 282, 290-93 (D.C. Cir. 1999). Notably, the Supreme Court also has recognized that the right to truthful housing information contained in the Fair Housing Act ("FHA")[13] supported the standing of a tester who sought housing information. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982).[14]

Other circuits similarly have acknowledged the informational injury doctrine, including in actions predicated on statutes protecting environmental stewardship. *See*, *e.g.*, *American Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 542 (6th Cir. 2004) (finding informational injury in agency's failure to comply with public disclosure requirements of the Clean Water Act, 33 U.S.C. § 1318(b)). These decisions have recognized that "[t]he 'inability to obtain information' required to be disclosed by

---

[12] (...continued)

*Id.* app. 2 § 10(b). Because "this provision 'affirmatively obligates the Government to provide access to the identified materials [papers, drafts, studies, agenda or other documents],' " *Cummock v. Gore*, 180 F.3d 282, 289 (D.C. Cir. 1999) (quoting *Food Chem. News v. Dep't of Health & Human Servs.*, 980 F.2d 1468, 1472 (D.C. Cir. 1992)), a commission member "suffered an injury under FACA insofar as the Commission denied her requests for information that it was required to produce." *Id.* at 290.

[13] The FHA makes it unlawful "to represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available . . . when such dwelling is in fact so available." 42 U.S.C. § 3604(d).

[14] The Supreme Court expressly has refused to consider whether an agency's failure to disclose reports under the Emergency Planning and Community Right-to-Know Act ("EPCRA") could constitute an informational injury. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 105 (1998).

statute constitutes a sufficiently concrete and palpable injury to qualify as an Article III injury-in-fact." *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 387 (5th Cir. 2003) (quoting *Akins*, 524 U.S. at 21). We have not had occasion to recognize definitively a standing claim based solely on informational injury.

It is notable that no cases have extended the reach of informational standing to the ARA. Nevertheless, in this case the plaintiffs urge a broad formulation of the informational injury concept. In their view, "[a] plaintiff suffers an informational injury when an agency refuses to provide the petitioner with information that he has an arguable right to obtain." Appellants' Br. at 16. We turn now to an analysis of their claims to determine whether, in the context of this case, that proposition can be squared with existing precedent.[15]

We first consider Mr. Bensman's theory of informational standing. It rests on a belief that his appeal, if considered by the Forest Service, (1) may lead the Service to conduct a more adequate analysis of its decision in the Chadwick Trails project and thereby allow him to comment upon future Forest Service action, or (2) may yield information on issues raised in his submission. The first hypothesis is too attenuated to support a claim of informational standing. No statute or regulation requires the Forest Service to revise its analysis in response to a filed appeal. Therefore, under this theory, there simply is no information to which Mr. Bensman may claim an entitlement. Any suggestion that

---

[15] The district court took the view that Mr. Bensman had suffered an informational injury but that Mr. Donham, who asserted the same injury, had not. We have difficulty perceiving a distinction between the two plaintiffs but shall review each individual separately.

Mr. Bensman's appeal would yield such a supplemental analysis is purely speculative.[16] *See Wertheimer v. Fed. Election Comm'n*, 268 F.3d 1070, 1074 (D.C. Cir. 2001) (denying an informational injury claim when the appellants failed to demonstrate "that the legal ruling they seek might lead to additional factual information").

Mr. Bensman's second claim is that he has been deprived of an informational right guaranteed by the appeals process. We do not believe that Mr. Bensman can find support for this theory of informational standing in the text of the ARA. The statute requires that the Secretary provide adequate opportunity for comment on the projects of the Service and further requires that those individuals, like Mr. Bensman, who participated in the notice and comment process be given an opportunity to comment on the proposed course of action. Unless the appeal is decided informally,

---

[16] There is no statutory or regulatory requirement that the Forest Service provide an "adequate analysis" of its decision. The statutory provisions indicate only that the Secretary "shall establish procedures . . . to give the . . . public adequate notice and an opportunity to comment." 16 U.S.C. § 1612(a); *see also id.* § 1612 note (a). Forest Service regulations in force at the time of this action further noted only that the deciding official "shall address comments received from the public during the comment period in an appendix to the environmental assessment," 36 C.F.R. § 215.6(d), and that the Service's decision document ("the document that records the decisions for actions implementing land and resource management plans," *id.* § 215.2) should be mailed to all participants in the notice and comment process, *id.* § 215.9, for possible appeal. Although Mr. Bensman disputes the thoroughness of the Service's decision document, there is no apparent standard by which to measure its adequacy apart from his belief that it provided insufficient information. Mr. Bensman's standing cannot rest upon a non-existent right to adequate analysis.

the statute further requires that an appeals review officer evaluate the participant's submission "and recommend in writing, to the official responsible for deciding the appeal, the appropriate disposition of the appeal." 16 U.S.C. § 1612 note (d)(2). "The official responsible for deciding the appeal shall then decide the appeal." *Id.* "If the Secretary fails to decide the appeal within [a] 45-day [review] period," the agency decision becomes final for APA purposes. *See id.* § 1612 note (d)(4).[17]

This broad language does not provide any explicit right to information. In fact, because the statute contemplates that the deciding officer might not even make a decision with respect to the matters raised on appeal, we cannot say that, standing alone, it grants Mr. Bensman or any other notice and comment participant a right to information.

Further, there is nothing in the ARA's history to indicate that Congress intended it as a vehicle for transmitting information to the public. Prior to 1992, no statutory provision required the Forest Service to provide an administrative appeals process for review of its decisions affecting national parks, although its regulations provided a process by which

---

[17] Service regulations in effect at the time of the incidents giving rise to this appeal seemed inconsistently both to *require* the deciding officer to issue a decision in the appeal within 45 days of filing, 36 C.F.R. § 215.17(a) (2001), and allow a deciding officer to forego a decision, *id.* § 215.17(b) ("*If a formal decision is not issued*, the Appeal Deciding Officer shall notify the appellant(s) of the disposition of their appeal." (emphasis added)). The Service subsequently corrected this inconsistency by requiring the deciding officer to "either," *id.* § 215.18 (b) (2004), issue an appeal decision within 45 days, *id.* § 215.18(b)(1), or not issue an appeal determination and notify the appellant that the challenged decision constitutes the agency's final action, *id.* § 215.18(b)(2), a choice that remains today in the Service's regulations.

to challenge decisions. In 1992, the Service determined that this voluntary provision of an appellate process had become too costly and burdensome to maintain, and promulgated proposed rules to exempt project-level decisions from review. The decision to eliminate such review sparked substantial negative comment from the public and prompted Congress to enact the ARA, thereby codifying the Service's obligation to entertain appeals of its decisions. *See generally Wilderness Soc'y v. Rey*, 180 F. Supp. 2d 1141, 1147 (D. Mont. 2002); *Idaho Sporting Cong., Inc. v. United States Forest Serv.*, 843 F. Supp. 1373, 1375 (D. Idaho 1994).

The ARA's history indicates that Congress intended the statute to restore the citizen participation that existed prior to the Service's proposed 1992 rule changes. In introducing the bill, Senator Fowler criticized the Service's proposal to modify "85 years" of public participation in Service decisions, and hailed the ARA as a way to open "a systematic channel for public participation . . . as well as maintaining an appeal system of review." 138 Cong. Rec. S11,643 (daily ed. Aug. 6, 1992) (statement of Sen. Fowler). He also noted that the appeals process "is simply a chance for a citizen's views, a taxpayer's views about his own forest" to be heard. *Id*.

By way of contrast, for example, FOIA's goal is "to serve the 'basic purpose of ensuring an informed citizenry, vital to the functioning of a democratic society.' " *Lakin Law Firm, P.C. v. FTC*, 352 F.3d 1122, 1123 (7th Cir. 2003) (quoting *Solar Sources, Inc. v. United States*, 142 F.3d 1033, 1037 (7th Cir. 1998)). Similarly, Congress intended the explicit reporting and informational requirements in FACA to control advisory committees and to allow public scrutiny of the advice provided to the Executive Branch by private individuals. *See Cummock*, 180 F.3d at 284-85. In short, statutes like FOIA and FACA that have served as the basis for informational

standing have a goal of providing information to the public; the ARA's goal is simply to increase public participation in the decision-making process. The difference in purposes seems to belie Mr. Bensman's claim that the ARA provides a right to information—i.e., a response to his submission—denied by the dismissal of his appeal.

It need not be fatal to the plaintiffs' claim, however, that an explicit right to information is not within the ARA's text or history. Although an act of Congress would seem to be necessary to establish a right to information sufficient to confer informational standing,[18] we have noted authority in other courts indicating that regulations or agency policies may be sufficient to create a right to information.[19] We therefore assume for the sake of argument that Mr. Bensman's injury may be based on a regulatory right to information, promulgated by the Forest Service under 16 U.S.C. § 1612.

At the time of the events giving rise to this cause of action, Forest Service regulations appeared both to mandate a decision by the appeals deciding officer, and to allow for the possibility that the officer need not actually render a decision at all, apparently consistent with 16 U.S.C. § 1612

---

[18] *See, e.g., Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998) (noting that a plaintiff suffers injury when he fails to obtain information "which must be publicly disclosed pursuant to *a statute*" (emphasis added)); *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 387 (5th Cir. 2003) (stating that the inability to obtain information "required to be disclosed *by statute*" constitutes an injury in fact (emphasis added)).

[19] *See, e.g., Animal Legal Def. Fund, Inc. v. Glickman*, 204 F.3d 229, 236 (D.C. Cir. 2000); *Chiron Corp. v. Nat'l Transp. Safety Bd.*, 198 F.3d 935, 942-43 (D.C. Cir. 1999).

note (d)(4); indeed, as noted above, the Service's current interpretation of the ARA appears to clarify that the officer need not issue a formal decision. To the extent that the Service by regulation did not (and does not) have to render a decision on an individual appeal under § 1612 note (d)(4), we certainly cannot say that the agency rules granted Mr. Bensman a right to any information contained in the deciding officer's potentially non-existent opinion. For the sake of argument, however, we shall accept that the regulations did, in fact, require the Service to render a decision on Mr. Bensman's appeal. *See* 36 C.F.R. § 215.17(a). Nevertheless, even if the Service had to consider his appeal, Mr. Bensman's claim to an informational injury could not stand on the Service's regulations. At the time of Mr. Bensman's appeal, the Forest Service's regulatory obligation was to "issue a written appeal decision either affirming or reversing the Responsible Official's decision, in whole or in part, and may include instructions for further action," and to send the decision to the appellant. *Id.* § 215.17(b). Further, Service regulations required the deciding officer to "briefly explain why the Responsible Official's original decision was affirmed or reversed, in whole or in part." *Id.* § 215.13(f)(3).[20] There is no indication, in the regulations or in the record, of the length or depth of

---

[20] Again, as with the Service's interpretation of 16 U.S.C. § 1612 note (4)(d), the Forest Service now seems to be of the opinion that the deciding officer's role in issuing decisions is even more limited. *See supra* note 17. The new provision, along with an admonition that the "publication date of the legal notice of the decision in the newspaper of record is the exclusive means for calculating the time to file an appeal [and] [a]ppellants should not rely on dates or timeframe information provided by any other source," 36 C.F.R. § 215.15(b)(3) (2004), is presumably intended to prevent litigation of this type in the future.

explanation required. Mr. Bensman does not specify the information that he hopes to receive from any decision explanation, although his declaration to the district court indicated that he believes the Service's failure to render a decision "deprives [him] of the opportunity to see and review the Forest Service's response to the issues that were raised in the appeal." R.38, Ex.2 ¶ 6.

Even a mandate for the deciding officer to "briefly explain" his reasons for affirming or reversing a previous decision certainly would not require the Forest Service to address the particular issues that Mr. Bensman would have raised, if his submission had been considered. The brief explanation requirement does not guarantee or promise to yield any factual information. *Wertheimer*, 268 F.3d at 1074. Unlike the FACA, for example, the ARA does not guarantee public access to agency documents or other specific information. *See* 5 U.S.C. app. 2 § 10(b) (specifying that "the records, reports, transcripts, minutes, appendixes, working papers, drafts, studies, agenda, or other documents which were made available to or prepared for or by each advisory committee shall be available for public inspection"). Nor can we say that the Service's failure to provide a brief explanation in affirming or denying an administrative appeal is in any way akin to an "informational injury . . . directly related to voting, the most basic of political rights." *Akins*, 524 U.S. at 24-25.

Indeed, Mr. Bensman's asserted informational injury, standing alone, seems not to be the deprivation of information, but an injury to his interest in ensuring that the Forest Service properly complies with the ARA. Such an interest is, fundamentally, a generalized interest in the Forest Service's application of its laws and regulations. "We have consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of

the Constitution and laws . . . does not state an Article III case or controversy." *Lujan*, 504 U.S. at 573-74; *cf. Common Cause*, 108 F.3d at 419 (noting, in rejecting the plaintiff's procedural standing theory, that "[t]o hold otherwise would be to recognize a justiciable interest in having the Executive Branch act in a lawful manner," and that "the Supreme Court held in *Lujan*[ ] [that this] is not a legally cognizable interest for purposes of standing").

Mr. Donham's informational standing claim is even weaker: his submission to the district court did not even allege a harm resulting from the deprivation of an appeal decision. However, given that both Mr. Bensman and Mr. Donham seem to assert the same ARA-based informational injury before this court, our determination as to the former is reason enough to decide against the latter.

### 4.

Mr. Bensman and Mr. Donham make an alternative argument. They claim that their interests in the land involved in the Chadwick Trails, Pole Lake and Plantation Lakes projects were injured by the Forest Service's dismissal of their administrative appeals. The district court disagreed with Mr. Donham, concluding that his statements did not indicate a sufficient interest in the land to permit the dismissal of his appeal to be characterized as an injury in fact for standing purposes. The court found no need to consider the sufficiency of Mr. Bensman's ties to land affected by the Chadwick Trails project, however, because it accepted his standing based on purely informational injury. Because the district court erred in determining that Mr. Bensman suffered such an informational injury, we also must review whether Mr. Bensman's interest in the land is sufficient for the dismissal of his appeal to constitute an injury in fact.

Even when challenging an agency's environmental determinations, "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000). This injury includes the lessening of recreational or aesthetic value of an area to a plaintiff as a result of agency action, "[b]ut the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Sierra Club v. Morton*, 405 U.S. 727, 734-35 (1972). To satisfy the Article III requirement of concrete and particularized harm, a plaintiff cannot merely offer "averments which state only that [the plaintiff] uses unspecified portions of an immense tract of territory, on some portions of which [damaging] activity has occurred or probably will occur by virtue of the governmental action." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990).[21]

In a previous case, we held that Heartwood, Mr. Bensman and Mr. Donham had standing to contest Forest Service procedures under the NEPA. We determined that the plaintiffs had averred sufficient potential injury to their interests in the land to establish an injury in fact. *See Heartwood, Inc. v. United States Forest Serv.*, 230 F.3d 947, 952 & n.5 (7th Cir. 2000). Our analysis in that case cannot control our decision here. The *Heartwood* appellants challenged policies of the Forest Service—categorical exclusions—affecting the entirety of every national forest in the Country. Here, they challenge only specific projects at three distinct national parks.

Mr. Donham, at the time of this action a resident of Brookport, Illinois, did not live on or near the land affected

---

[21] We shall examine Mr. Donham's and Mr. Bensman's submissions with this standard in mind.

by the Pole Lake and Plantation Lakes projects—the Hiawatha and Ottawa National Forests in Michigan's Upper Peninsula. His connection to the land stems mainly from his employment as a Heartwood forest monitor with responsibility to comment on Forest Service activities in the two national parks. Mr. Donham has limited personal ties to the land in question, which he set forth in his declaration to the district court:

> I first visited the Upper Peninsula in 1981. A very close friend and business associate that I had worked with in the treeplanting business had inherited a farm in the Keweenaw peninsula. We spent some time up there and looked around at the national forests and the magnificent great lakes. Since I started to work on northwoods issues [for Heartwood], I have been back three times and absolutely love it. I have visited areas on the Hiawatha and Ottawa, some of the very areas which are subject to the decisions involved in this lawsuit. I absolutely love the Upper Peninsula forest and want to come back to visit them as often as I can. I have relatives in Michigan and in the very northern part of Wisconsin that we are beginning to visit on a regular basis, providing us with a great excuse to recreate in the region.

R.38, Ex.1 ¶ 8. Subsequent declarations clarified that he visited Ottawa National Forest a total of four times since 1981, most recently in 2001, R.50 ¶¶ 3-4, and that he visited Hiawatha National Forest twice at unspecified times, R.50 ¶ 6. Mr. Donham further presented some evidence, in the form of Forest Service telephone records, that he visited the Plantation Lakes area specifically in late June of 2001.

The district court correctly determined that Mr. Donham did not assert a sufficient interest in the project areas to constitute a concrete and particularized injury from the dis-

missal of his appeal. He lives far from the project areas, and does not claim that the Pole Lake or Plantation Lakes projects prevent him from using areas of the national parks. *Cf. Friends of the Earth*, 528 U.S. at 181-83 (finding injury to plaintiffs living from one-quarter to two miles from project site). His submissions do not indicate that he has visited the Pole Lake project, only a generalized interest in the Hiawatha Forest as a whole, *Nat'l Wildlife Fed'n*, 497 U.S. at 887 (rejecting plaintiff's claim of injury based on use of land "in the vicinity" of the project area), and there are no indications of planned future visits to either project area. We also note that his past visits to the area cannot serve as the basis for his injury, and his vague " 'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564.

Mr. Donham averred a specific injury to his interest in the Plantation Lakes area of Ottawa National Forest resulting from the dismissal of his appeal. The environmental impact statement ("EIS") and record of decision ("ROD") released in connection with the project did not include information that he provided about the location of a red-shouldered hawk nest. Mr. Donham argues that consideration of his appeal would result in disclosure of this site and protection of the nest.[22] This threatened injury to a protected species is

---

[22] The Forest Service confirms that Mr. Donham reported this nest, but asserts that his argument is without merit because the EIS/ROD was signed on June 11, 2001, fourteen days before his sighting. As Mr. Donham based his appeal on the EIS/ROD, the Service believes that the nest, which he found after the Service's decision, cannot be the basis of any claimed injury. The Forest
(continued...)

purely conjectural, but even if we assumed that the injury is concrete and particularized, Mr. Donham offers "no facts . . . showing how damage to the species will produce imminent injury" to him. *Lujan*, 504 U.S. at 564 (internal quotation omitted). Significantly, Mr. Donham does not aver any damage to his aesthetic or recreational interest in Ottawa National Forest—where he admittedly has spent more time—beyond this interest in seeing the red-shouldered hawk nest protected.

As for Hiawatha National Forest, Mr. Donham's submissions indicate only that his aesthetic or recreational interests are harmed because "[l]ogging a forest degrades it for wildlife such as Scarlet tanager and therefore injures [his] use and enjoyment of the forest." R.50 ¶ 7. His assertion is a claim that logging generally harms aesthetic interests. Given that he demonstrated no ties to the Hiawatha forest and failed to show how the Pole Lake project would injure his enjoyment of the Hiawatha forest, his complaint about general logging is an interest insufficient to confer standing.

Mr. Donham has suffered no injury from the Forest Service dismissing his appeal. We therefore affirm the district court's determination that Mr. Donham does not have standing to challenge the Service's decision.

At the time of this action, Mr. Bensman resided in Wood River, Illinois—closer to Mark Twain National Forest than Mr. Donham was to the areas of his responsibility, but still not on or near the national park. His declaration to the

---

[22] (...continued)
Service's argument might have merit if the issue was injury from the EIS/ROD, but Mr. Donham claims injury from the dismissal of his appeal, which attempted to amend the EIS/ROD to include this nest.

district court was both more detailed and more definite than that of Mr. Donham:

> I have personally used and enjoyed the Mark Twain National Forest including the Chadwick project area for more than 20 years for outdoor recreation, canoeing, camping, hiking, scientific study, photography, bird watching, plant identification, nature study, and solitude. I have been to the Chadwick area about a half dozen times. My first visit was April 9-10, 1993. My most recent visit was May 20, 2000. My past use of the Chadwick area includes hiking, wildlife viewing, nature study, and photography. I plan to continue to use the Chadwick area including a trip this winter or next spring.

R.38, Ex.2 ¶ 3. Mr. Bensman also described the harm that would result to his recreational interest in the Chadwick Trails area if the Service did not consider his appeal, noting that "[t]he Forest Service's dismal [sic] of my appeal harms me as the appeal asked for the area to be closed to ATVs and ORVs. If this relief was granted, my future hikes in the area would be much more enjoyable." R.38, Ex.2 ¶ 6.

Mr. Bensman has demonstrated both sufficient interest in the Mark Twain National Forest and sufficient possibility of injury to that interest to have constitutional standing to challenge the Service's decision. While his past visits are not dispositive, they are sufficient in number and in temporal proximity to lend credence to his plans to return to the forest "this winter or next spring." His intention to return is expressed more concretely than the vague plans rejected in *Lujan*. He has demonstrated an interest in the particular area in question here, rather than just the forest as a whole, in his statement that he visited the Chadwick Trails area "about a half-dozen times." In addition, he has

demonstrated how the project at issue, which concerns the routing of off-road vehicle trails, will hurt his enjoyment of the land.

We therefore agree with the district court that Mr. Bensman has standing[23] to challenge the Service's dismissal of his administrative appeal, but based on his interest in the land.

## B. Equitable Estoppel and Equitable Tolling

Because we conclude that Mr. Bensman has standing, we must determine whether the lateness of his filing is excused by the application of either the doctrine of equitable tolling or the doctrine of equitable estoppel.

The Forest Service's decision to dismiss the appeal as untimely may only be set aside if arbitrary and capricious. 5 U.S.C. § 706; *Common Cause*, 108 F.3d at 415. The ARA and Service regulations governing the time period during which a notice and comment participant may appeal a Service decision were non-permissive. The ARA provides that a party may appeal "[*n*]*ot later than 45 days* after the issuance

---

[23] In addition to the constitutional question of standing, which satisfies the "case" or "controversy" requirement of Article III, "the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing." *Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 474 (1982). These prudential considerations, which may be abrogated by Congress, require a plaintiff to identify the agency action affecting his interests, *see Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 83 (D.C. Cir. 1991), and to demonstrate "that [the] plaintiff's grievance must arguably fall within the zone of interests protected or regulated by the statutory provision . . . invoked in the suit," *Bennett v. Spear*, 520 U.S. 154, 162 (1997). Although the ARA does not provide a right to information, it does serve to protect a plaintiff's interest in the land. We thus find no reason to deny Mr. Bensman standing on prudential grounds.

of a decision of the Forest Service." 16 U.S.C. § 1612 note (c) (emphasis added). Service regulations clarified that, for appeal purposes, the date of issuance was the date that notice of the decision was published in an identified newspaper of record. 36 C.F.R. § 215.9. The 45-day window opened on the date of publication, *id.* § 215.13, and the regulation mandated that the Service "*shall dismiss* an appeal without review when" an appeal was postmarked after the 45-day period ended, *id.* § 215.15(a)(1) (emphasis added). The parties here do not contest that the appeals of both Mr. Bensman and Mr. Donham were postmarked after the 45-day window closed, and the Service had no choice but to dismiss their submissions. We cannot say that, in the absence of equitable tolling or equitable estoppel, the Forest Service's decision to dismiss the appeals without consideration was arbitrary and capricious because the Service had no discretion to do otherwise.

Mr. Bensman invokes the doctrines of equitable tolling and equitable estoppel, arguing that the Forest Service is barred from dismissing his appeal as untimely when the Service itself supplied him with incorrect 45-day calculations. Nevertheless, we believe that the doctrines of equitable tolling and equitable estoppel are inapplicable here.

The district court expressed doubt that the doctrines of equitable tolling and equitable estoppel could be applied to decisions of the Forest Service. Indeed, this court "may not extend the time to file . . . a notice of appeal from . . . or otherwise review an order of an administrative agency . . . unless specifically authorized by law." Fed. R. App. P. 26(b)(2); *see Nowak v. INS*, 94 F.3d 390, 391 (7th Cir. 1996). There appears to be no such authority in the ARA, nor have the parties invited our attention to any. We need not determine the doctrines' applicability to Service decisions in this case, however, because we agree with the district court that

Mr. Bensman has not made the showing necessary to warrant application of either equitable tolling or equitable estoppel.

Equitable tolling is a doctrine used sparingly, reserved for those situations in which extraordinary circumstances prevent a party from filing on time. *Wilson v. Battles*, 302 F.3d 745, 749 (7th Cir. 2002). It applies only to cases in which circumstances prevent a litigant from filing despite the exercise of due diligence, *id.* at 748, regardless of the defendant's conduct, *Bishop v. Gainer*, 272 F.3d 1009, 1014 (7th Cir. 2001). The district court's critical inquiry is thus whether the plaintiff has exercised due diligence, a finding that we review for clear error. *Montenegro v. United States*, 248 F.3d 585, 591 (7th Cir. 2001), *overruled on other grounds by Ashley v. United States*, 266 F.3d 671 (7th Cir. 2001); *see Drew v. Dep't of Corrs.*, 297 F.3d 1278, 1287 n.2 (11th Cir. 2002) (collecting cases).

The district court determined that Mr. Bensman could have filed within 45 days of the Service's decision publication. He was experienced with the agency's appeals process. He had access to the necessary information, and, indeed, the Service's decision notices directed his attention to the applicable regulations. Further, the Service's mailings alerted Mr. Bensman that the dates were not definite, because they noted a "planned" publication date. Although Mr. Bensman argues that he cannot afford to subscribe to every newspaper of record and thus relies on the Service-provided dates, the argument is merely one factor to weigh in the due diligence inquiry. We can find no clear error in the district court's determination that Mr. Bensman could have filed in time had he exercised due diligence. We therefore find no error in the district court's refusal to equitably toll the regulatory filing requirements.

Equitable estoppel is a limited doctrine that applies only when a " 'defendant takes active steps to prevent the plaintiff from suing on time.' " *Brademas v. Indiana Hous. Fin. Auth.*, 354 F.3d 681, 687 (7th Cir. 2004) (quoting *Sharp v. United Airlines, Inc.*, 236 F.3d 368, 372 (7th Cir. 2001)). A plaintiff invoking equitable estoppel against the Government must show that the agency engaged in affirmative misconduct rather than mere negligence. *Lewis v. Washington*, 300 F.3d 829, 834 (7th Cir. 2002). Although Mr. Bensman argues that the Service's dismissal of his appeal after providing incorrect dates constitutes "blameworthy conduct," Appellants' Br. at 43-47, he has not demonstrated any affirmative misconduct. There is no evidence that the Forest Service intended to mislead him; at worst the Service negligently miscalculated the correct appeal dates. Without a showing of affirmative misconduct, equitable estoppel is unavailable to Mr. Bensman.[24]

---

[24] In *Edgewater Hospital, Inc. v. Bowen*, 857 F.2d 1123 (7th Cir. 1988), *amended on other grounds*, 866 F.2d 228 (7th Cir. 1989), the plaintiff had 180 days to appeal an unfavorable reimbursement notice, but the Government issued a second notice stating that the provider had 180 days to appeal from the second notice. This court held that the 180-day period ran from the first notice and that the mistaken second notice was not sufficient to invoke equitable tolling. *See also Dawkins v. Witt*, 318 F.3d 606, 611 (4th Cir. 2003) (holding that misrepresentations that the agency would not enforce 60-day filing deadline were insufficient to trigger equitable estoppel). *But see Bailey v. West*, 160 F.3d 1360, 1365 (Fed. Cir. 1998) (finding that court of veterans claims could equitably toll 120-day filing limit if agency induced veterans' reliance, even without showing of misconduct).

A few cases emphasize the related point that equitable tolling or estoppel may not lie in the face of Government error when the statutory requirements are clear. As applied, the ARA does not

(continued...)

## Conclusion

For the foregoing reasons, we affirm the judgment of the district court.

AFFIRMED

---

[24] (...continued)

appear to give the Service discretion to hear an untimely appeal. *See* 16 U.S.C. § 1612 note (c) ("Not later than 45 days after the date of issuance of a decision . . . ."); *Trapper Mining Inc. v. Lujan*, 923 F.2d 774, 781 (10th Cir. 1991) (holding 1989 readjustment of lease appropriate, although agency earlier promised not to readjust until 1999, because " 'the United States is neither bound nor estopped by acts of its officers or agents in entering into an arrangement or agreement to do or cause to be done what the law does not sanction or permit.' A party who enters an arrangement with the government and relies on an official's interpretation of the law 'assume[s] the risk that that interpretation [is] in error.' " (citations omitted)); *see also In re Larson*, 862 F.2d 112 (7th Cir. 1988) (noting that reliance on erroneous IRS agent advice not reasonable when provisions of Bankruptcy Code were clear). The appellants bear the ever-present risk that a Government agent may offer erroneous information. *See Trapper Mining*, 923 F.2d at 781; *S & M Invest. Co. v. Tahoe Reg'l Planning Agency*, 911 F.2d 324, 329 (9th Cir. 1990) (citing *Schweiker v. Hansen*, 450 U.S. 785 (1981), and noting that there is always the risk that misinformed agency employees may err in their regulatory interpretation; such error does not rise to the level of affirmative misconduct). It is particularly appropriate for the appellants to bear the risk of error where, as here, they are experienced in working with the Government. *See Boulez v. Comm'r of Internal Revenue*, 810 F.2d 209, 218 n.68 (D.C. Cir. 1987); *see also Lehman v. United States*, 154 F.3d 1010, 1017 (9th Cir. 1998) (noting that plaintiffs were not ignorant of relevant facts in part because statutory limitations requirement was clear).

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*