In the

# United States Court of Appeals

### For the Seventh Circuit

No. 06-4045

SIERRA CLUB,

*Plaintiff-Appellee*,

*v.*

FRANKLIN COUNTY POWER OF ILLINOIS, LLC,
formerly known as ENVIROPOWER OF ILLINOIS, LLC,
ENVIROPOWER, LLC, and KHANJEE HOLDING (US), INC.,

*Defendants-Appellants*.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 05 C 4095—**J. Phil Gilbert**, *Judge*.

ARGUED OCTOBER 29, 2007—DECIDED OCTOBER 27, 2008

Before BAUER, RIPPLE, and WILLIAMS, *Circuit Judges*.

WILLIAMS, *Circuit Judge*.   Franklin County Power of Illinois, LLC, wants to build a coal power plant in southern Illinois. Because the plant will emit a significant amount of air pollution, the Company must first obtain a "Prevention of Significant Deterioration" (PSD) permit from the Illinois Environmental Protection Agency (IEPA),

the agency that the federal EPA has designated as the issuer of PSD permits in Illinois. Although the IEPA granted the Company a PSD permit in 2001, the IEPA has since made a "preliminary determination" that the permit has expired.

Sierra Club is a non-profit environmental organization that sought to enjoin the Company from building the power plant by bringing this suit against the Company, its parent company EnviroPower, LLC, and Khanjee Holding (US), Inc., under a citizen suit provision of the Clean Air Act. Sierra Club alleged that the Company's 2001 PSD permit had expired because the Company had neglected to "commence construction" of the plant within an 18-month window required under the permit. Sierra Club also claimed the permit was invalid under EPA regulations because the Company had discontinued construction of the plant for over 18 months. The district court agreed with Sierra Club on both points and granted summary judgment in its favor. The court also permanently enjoined the Company from building the plant until it obtained a new PSD permit, and the defendants appealed to this court.

We agree with the district court that Sierra Club has standing to pursue this lawsuit and that its claim is ripe and permissible under the Clean Air Act. We also agree that the 2001 PSD permit has expired and that the district court properly granted permanent injunctive relief in favor of Sierra Club. Therefore, we affirm the district court's grant of summary judgment in favor of Sierra Club.

## I. BACKGROUND

### A. Statutory and regulatory framework

Sierra Club brought this suit under 42 U.S.C. § 7604(a)(3), a citizen suit provision of the Clean Air Act, which provides in relevant part:

> [A]ny person may commence a civil action on his own behalf . . .
>
> > (3) against any person who proposes to construct or constructs any new or modified major emitting facility without a permit required under [42 USCS §§ 7470 et seq.] (relating to significant deterioration of air quality) . . . or who is alleged to have violated (if there is evidence that the alleged violation has been repeated) or to be in violation of any condition of such permit.

The parties agree that the coal power plant that the Company seeks to build is a "major emitting facility" that requires a PSD permit. Such a permit contains an emission limitation that is set by the IEPA and represents the "best available control technology" for pollution. *See* 42 U.S.C. § 7475(a).

Once issued, a PSD permit can expire and become invalid in three different ways:

> [a] [I]f construction is not commenced within 18 months after receipt of such approval,
>
> [b] if construction is discontinued for a period of 18 months or more, or

    [c] if construction is not completed within a rea-
        sonable time.

40 C.F.R. § 52.21(r)(2). The IEPA Administrator "may
extend the 18-month period upon a satisfactory showing
that an extension is justified," *id.*; otherwise, the PSD
permit terminates by "automatic expiration." 40
C.F.R. § 124.5(g)(2) ("PSD permits may be terminated
only by recission under § 52.21(w) or by automatic ex-
piration under § 52.21(r)(2).").

## B.  Factual background

On August 15, 2000, the Company applied to the IEPA
for a PSD permit to build a 600 megawatt[1] coal-fired
power plant in Benton, Illinois, on land for which it had
a 99-year lease. The IEPA concluded the project would
be a major air pollution source subject to PSD review. On
July 3, 2001, the IEPA issued a PSD permit for the plant.
The permit states it will become invalid if:

> construction of CFB [circulating fluidized bed]
> boilers is not commenced within 18 months after
> this permit becomes effective, if construction of
> these boilers is discontinued for a period of 18
> months or more, or if construction of these boilers is
> not completed within a reasonable period of time.

---

[1] Sierra Club claims the permit only authorized a 500 MW, not
a 600 MW, facility. Because the defendants lost on summary
judgment, we construe all facts in the light most favorable to
them. *See Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 755 (7th
Cir. 2008).

The permit defines "commence" and "construction" in terms of 40 C.F.R. § 52.21(b)(9) and § 52.21(b)(8), respectively, which are provisions we will discuss in more detail later.

On December 2, 2002, the Company entered into an agreement with Black & Veatch (B&V), an engineering and construction company, that required the parties to "work together on an exclusive basis . . . in order to draft and negotiate the EPC [Engineering, Procurement and Construction] Contract." On about December 18, 2002, the Company contracted with Alberici Constructors, Inc., for on-site excavation and foundation work. Alberici was to dig a hole at the site down to the bedrock and pour concrete to lay part of the foundation for the plant. On January 3, 2003, four Alberici employees began delivering equipment to the site, and five days later, they began excavating.

On February 14, 2003, Alberici stopped the excavation after a dispute arose regarding payment. Alberici's bills after that date include one day where workers showed up but did no work. All other days only include a supervisor's hours spent maintaining a protective barricade around the site.

In July 2004, the Company's landlord had the hole refilled, apparently because the Company did not make a payment on its lease. In September 2004, the Company signed another contract for excavation and concrete work, which began anew on September 29, 2004. An IEPA inspector visited the plant site shortly thereafter and determined that construction had commenced.

In the meantime, co-defendant Khanjee Holding (US), Inc. had obtained an option to buy the Company and all its assets. In June 2003, Khanjee affirmed its obligation to adhere to the Company's contract with B&V. In January 2004, the Company secured a mandate letter from its lead financial arranger indicating that financing for the project was available.

On November 19, 2004, the IEPA notified the Company that it had "made a preliminary finding" that its PSD permit had expired. The Company challenged this preliminary determination and as far as we know, that matter remains pending before the IEPA.

On May 20, 2005, Sierra Club filed this suit, alleging that the 2001 PSD permit had expired and was invalid. The defendants moved to dismiss, claiming that the citizen suit provision of the Clean Air Act did not provide a basis for this suit. They also moved for summary judgment, claiming that Sierra Club lacked standing and that the permit was valid. Sierra Club countered with its own motion for summary judgment.

The district court denied the defendants' motions and found the permit to be invalid. It entered summary judgment in Sierra Club's favor and permanently enjoined the defendants from building the plant until they obtained a valid permit. The defendants then filed this appeal.

## II. ANALYSIS

### A. Sierra Club had standing.

An organization has standing to sue if (1) at least one of its members would otherwise have standing; (2) the interests at stake in the litigation are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires an individual member's participation in the lawsuit. *See Friends of the Earth, Inc. v. Laidlaw Env'l Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (citing *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)). The defendants do not seriously contest that Sierra Club satisfies prongs (2) and (3). Sierra Club is a nonprofit organization formed and operated to "preserve, protect, and enhance the natural environment," which is also its stated goal in bringing this lawsuit. The defendants also do not suggest this proceeding requires an individual Sierra Club member to participate; rather, they claim that Sierra Club has not presented an individual member with standing. So the dispute here turns on prong (1).

To have standing, an individual must satisfy three requirements. First, she must have suffered an "injury in fact" that is both (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. Second, the injury must be fairly traceable to the challenged action. Third, it must be likely, not just speculative, that a favorable decision will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Because these elements "are not mere pleading requirements but rather an indispensable part of the . . . case, each element

must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561.

To survive a defendant's motion for summary judgment (or to win on a cross-motion for summary judgment), a plaintiff cannot rely on mere allegations but must support each element by specific facts via affidavits or other evidence. *See id.* We review de novo the district court's determination that Sierra Club has standing. *See Disability Rights Wis. Inc. v. Walworth County Bd. of Supervisors*, 522 F.3d 796, 800 (7th Cir. 2008).

### 1. Sierra Club member Barbara McKasson will suffer injury in fact.

Sierra Club relies on one of its members, Barbara McKasson, to establish standing. "[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity." *Laidlaw*, 528 U.S. at 183 (internal quotation marks omitted). McKasson states in an affidavit that she will experience diminished aesthetic and recreational value if the Company constructs and operates the power plant under the 2001 PSD permit. She explains that every other year since 1987, McKasson and her family have taken trips to fish, kayak, camp, and enjoy the natural beauty and clean environment of Rend Lake, located three miles from the proposed plant site. She claims if the Company builds the plant under the 2001 permit, she will cease her biennial recreational trips

because the pollutants emitted based on the permit will harm her and diminish her aesthetic enjoyment of Rend Lake.

The defendants claim that McKasson's injury is insubstantial, but the "injury-in-fact necessary for standing 'need not be large, an identifiable trifle will suffice.' " *Lafleur v. Whitman*, 300 F.3d 256, 270 (2d Cir. 2002) (quoting *Sierra Club v. Cedar Point Oil Co., Inc.*, 73 F.3d 546, 557 (5th Cir. 1996)); *see also Doe v. County of Montgomery*, 41 F.3d 1156, 1159 (7th Cir. 1994) ("[A]n identifiable trifle is enough for standing to fight out a question of principle . . . ." (quoting *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n.14 (1973))). If the proposed plant is built, McKasson will be exposed to emissions from the plant if she continues her long-standing tradition of visiting Rend Lake with her family. This "likely exposure" to pollutants is "certainly something more than an 'identifiable trifle,' even if the ambient level of air quality does not exceed [certain national limits]." *Lafleur*, 300 F.3d at 270-71; *see also Bensman v. United States Forest Serv.*, 408 F.3d 945, 962-63 (7th Cir. 2005) (individual had standing to challenge a proposed project in a national forest when he had visited the project area six times over 20 years and planned to return soon). Moreover, if McKasson foregoes her regular visits to the lake because of these pollutants, that would also constitute an injury-in-fact. *See Laidlaw*, 528 U.S. at 183 (individual's affidavit stating that he foregoes using a river for recreational purposes because of pollution concerns was sufficient to show injury-in-fact); *see also Buono v. Norton*, 371 F.3d 543, 547 (9th Cir. 2004) ("We have repeat-

edly held that inability to unreservedly use public land suffices as injury-in-fact."). McKasson's injuries are also ones that are "concrete and particularized" because they affect her in a "personal and individual way." *See Lujan*, 504 U.S. at 560 & n.1; *Coalition for the Env't v. Volpe*, 504 F.2d 156, 167 (8th Cir. 1974) (holding that a proposed development that would increase pollution and traffic and limit plaintiffs' views was a cognizable injury that deprived plaintiffs of aesthetic and psychological benefit).

The defendants also argue that because the plant will take years to build, McKasson's injury is not "actual or imminent" and does not meet the second requirement for injury in fact. But the defendants forget that threatened injury can satisfy Article III standing requirements. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) ("[O]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending that is enough."); *see also Massachusetts v. EPA*, 127 S. Ct. 1438, 1455 (2007) (EPA's refusal to regulate greenhouse gas emissions presented an imminent risk of harm); *Mainstreet Org. of Realtors v. Calumet City*, 505 F.3d 742, 744 (7th Cir. 2007) ("[S]tanding in the Article III sense does not require a certainty or even a very high probability that the plaintiff is complaining about a real injury, suffered or threatened."). The Company claims that the PSD permit that it received is still valid, and it (strenuously) argues that it has actually begun construction of the plant. As a practical matter, it makes sense for Sierra Club to challenge the validity of the Company's permit now, rather than waiting until the plant is operational. *See Lafleur*, 300

F.3d at 270 (likely exposure to emissions from a proposed but not yet built facility was "certainly an injury-in-fact"). Moreover, while this suit has been pending, the Company has again publicly announced its commitment to completing the plant. So "[t]his is not a case of some abstract psychic harm or a one-day-I'll-be-hurt allegation . . . ." *Mainstreet*, 505 F.3d at 745. Injury to McKasson has been freshly threatened and is not merely hypothetical.

### 2. The injury is traceable to the proposed construction under the 2001 permit.

Sierra Club must also demonstrate that McKasson's injury is "fairly traceable" to the Company's construction of the plant under the 2001 PSD permit. *See Texas Indep. Producers & Royalty Owners Ass'n v. EPA*, 410 F.3d 964, 972 (7th Cir. 2005). If the "independent action of some third party not before the court" causes McKasson's injury, then the complaint fails the traceability test. *Id.* (quoting *Lujan*, 504 U.S. at 560) (internal quotation marks omitted).

The defendants concede that under the 2001 PSD permit the proposed plant will emit airborne pollutants, including mercury and particulate matter, three miles from Rend Lake. McKasson claims these pollutants and the resulting decrease in visibility will negatively impact her enjoyment of the lake. We agree that "[w]here a plaintiff has pointed to a polluting source as the seed of his injury, and the owner of the polluting source has supplied no alternative culprit, the 'fairly traceable' requirement can be said to be fairly met." *Friends of the Earth v. Gaston*

*Copper Recycling Corp.*, 204 F.3d 149, 162 (4th Cir. 2000). Here, the defendants point to no other polluting source that could be the cause of McKasson's injury.

Nonetheless, the defendants claim Sierra Club still cannot show causation because the Company has designed its plant to produce emissions below permitted levels, so until the plant is built, there remains a factual question whether McKasson will actually be injured. This argument is in essence just a variation on the defendants' claim (rejected above) that McKasson has not yet suffered an "actual" or "imminent" injury. We agree that no one knows the ultimate magnitude of McKasson's injury—for example, we don't know if the particulate matter from the plant will blot out the sky or merely create a thin haze that's not visible to the naked eye, or if the airborne mercury will actually spread 45 miles to poison fish that McKasson currently consumes from a pond near her home (which is another harm she claims she will suffer). We do know, however, that the plant will release some pollutants and that McKasson believes these pollutants will ruin her ability to enjoy Rend Lake and taint the surrounding area. And her belief is not so irrational that it can simply be discredited. *See Laidlaw*, 528 U.S. at 182-83 (finding that a local citizens group member suffered injury in fact because she believed that discharged pollutants had lowered her home's value). Because McKasson's injury stems from the emissions of the Company's proposed plant, we find that her threatened injury is fairly traceable to the plant.

**3. Enjoining the Company from building based on its 2001 permit would likely redress McKasson's injury.**

Finally, a plaintiff must show that a favorable decision will likely, not just speculatively, relieve her injury. *Id.* at 181. The defendants contend that the IEPA might not set lower emissions levels for a new PSD permit and that McKasson's concerns might remain even if the plant polluted at lower emission levels.

The defendants' argument, of course, presumes that the Company will actually seek out and receive a new permit. Despite publicly announcing that it would seek a new permit after it lost in the district court, the Company represented at oral argument that it had not yet begun this process. And even if the Company applied for and received a new permit, there would be some delay (the IEPA took almost a year before granting the 2001 permit) before the Company could begin construction. A decision in favor of Sierra Club, therefore, would at least redress McKasson's injury during that time.

Moreover, as Sierra Club notes, pollution control technology tends to improve over time, so it makes sense that a new permit would have more stringent emission standards than the 2001 permit. *See* 42 U.S.C. § 7475(a)(4) (major-emitting facilities must use the best available control technology to receive PSD permits); *In re W. Suburban Recycling and Energy Ctr., L.P.,* 8 E.A.D. 192 (EPA App. Bd. 1999). Indeed, the record indicates that the IEPA issued PSD permits in 2003 and 2005 for similar coal-fired power plants with emission standards that

were significantly more stringent than those in the Company's 2001 permit. It is therefore reasonable to believe that any new permit the Company obtains will have tougher emission standards than the 2001 PSD permit. We need not determine exactly how much tougher those standards will be because McKasson need not show that a favorable decision will relieve her every injury. *Massachusetts*, 127 S. Ct. at 1458 (citing *Larson v. Valente*, 456 U.S. 228, 244 n.15 (1982)). It is enough that her concerns will be addressed if more stringent emission standards are imposed than those required under the 2001 permit, even though the plant will still emit some pollutants if the Company obtains a new PSD permit. *See id.* at 1458 n.23 ("[E]ven a small probability of injury is sufficient to create a case or controversy . . . provided of course that the relief sought would, if granted, reduce the probability." (quoting *Vill. of Elk Grove Vill. v. Evans*, 997 F.2d 328, 329 (7th Cir. 1993))). So it is likely that a favorable decision here will redress McKasson's, and hence Sierra Club's, injury.

Therefore, we conclude that Sierra Club has organizational standing to pursue this suit because it has shown that the Company's construction under the expired 2001 PSD permit would cause at least one of its members[2] to suffer injury in fact that is traceable to the Company and is redressable if Sierra Club prevails here.

---

[2] Sierra Club has another "standing plaintiff" but like the district court, we find it unnecessary to address her claims because McKasson has standing to sue.

**B.  Sierra Club's claim is ripe and permissible under 42 U.S.C. § 7604(a)(3).**

The defendants rely on two district court decisions to argue that Sierra Club's claim is not ripe. *See United States v. Ill. Power Co.*, 245 F. Supp. 2d 951, 956-57 (S.D. Ill. 2003); *New York v. Niagara Mohawk Power Corp.*, 263 F. Supp. 2d 650, 661 (W.D.N.Y. 2003). The defendants contend that Sierra Club must wait until the Company actually begins constructing the plant before Sierra Club can allege that the Company has violated its preconstruction PSD permit.

The defendants misread these cases, which specify when the limitations period begins for claims that a company has violated a preconstruction permitting requirement. In that context, it makes sense to conclude that the last possible moment at which a preconstruction violation occurs is "when the actual construction is commenced, and not at some later point in time." *Ill. Power Co.*, 245 F. Supp. 2d at 957; *see Niagara Mohawk Power Corp.*, 263 F. Supp. 2d at 661-62. But it does not logically follow (nor do these cases suggest) that a preconstruction permit violation cannot occur until actual construction begins.

The defendants also argue that the citizen suit provision that Sierra Club relies upon, section 7604(a)(3), only allows suits against entities that are "without a permit," so Sierra Club cannot bring this suit because the Company received a permit (albeit one that may no longer be valid). The defendants cite no direct support for this position, instead claiming the matter is not ripe and cannot be

adjudicated until the IEPA issues a final decision whether the Company's 2001 permit has expired.

The defendants' argument ignores the explicit language of section 7604(a)(3). That provision states that "any person may commence a civil action on his own behalf . . . against any person . . . who is alleged . . . to be in violation of any condition of [a PSD] permit." The Company certainly is a person alleged to be in violation of a PSD permit—Sierra Club alleges that the Company violated the terms of its permit by not commencing construction of its facility in a timely fashion, which in turn caused the permit to expire. *See* 40 C.F.R. § 124.5(g)(2). And the IEPA made the same allegation when it preliminarily found that the Company's permit had expired. Moreover, even if having an expired permit were akin to having no permit at all, Sierra Club would still be able to sue under section 7604(a)(3), which enables citizens to sue entities like the Company that "propose[] to construct . . . new or modified major emitting facilit[ies] without a [PSD] permit." 42 U.S.C. § 7604(a)(3) (emphasis added).

It is irrelevant that the IEPA has yet to finish deciding whether the Company's permit is invalid because that's not what section 7604(a)(3) requires. In a circuit case referenced by both parties, *Grand Canyon Trust v. Tucson Elec. Power Co.*, 391 F.3d 979, 986 (9th Cir. 2004), the Ninth Circuit held that a district court had jurisdiction over a citizen suit that challenged the validity of a permit even though the EPA had not yet acted to revoke the permit. The defendants claim *Grand Canyon* analyzed a different citizen suit provision than the one at issue here.

That seems doubtful. *See id.* at 985 ("Unauthorized construction of a power plant violates the Clean Air Act and provides grounds for a citizen suit under the Act's citizen suit provision. *See* 42 U.S.C. § 7604(a)(3) . . . "). Regardless, *Grand Canyon* does not suggest there is a categorical rule requiring a plaintiff to wait until the relevant agency finishes deciding whether a permit is valid (at least when, as here, a suit is not asking us to review an agency action). So in accordance with the plain language of section 7604(a)(3), we find that Sierra Club has properly brought this suit under that provision.

### C.  The Company did not "commence construction" of the plant.

As noted above, a PSD permit can expire and become invalid in one of three ways: (1) if construction is not "commenced" within 18 months after receipt of the permit, (2) if construction is discontinued for a period of 18 months or more after construction has begun, or (3) if construction is not completed within a reasonable time. *See* 40 C.F.R. § 52.21(r)(2). Similarly, the Company's PSD permit stated it would become invalid if:

> construction of CFB [circulating fluidized bed] boilers is not commenced within 18 months after this permit becomes effective, if construction of these boilers is discontinued for a period of 18 months or more, or if construction of these boilers is not completed within a reasonable period of time.

The permit issued on July 3, 2001, so its drop-dead date was January 3, 2003.[3] The question is whether the Company "commenced" construction of its plant by that deadline.

42 U.S.C. § 7479(2)(A) states there are two ways in which construction can "commence":

> (i)  [the owner or operator has] begun, or caused to begin, a continuous program of physical on-site construction of the facility or

> (ii) [the owner or operator has] entered into binding agreements or contractual obligations, which cannot be canceled or modified without substantial loss to the owner or operator, to undertake a program of construction of the facility to be completed within a reasonable time.

*See also* 40 C.F.R. § 52.21(b)(9) (defining "[c]ommence as applied to construction" similarly). The district court concluded the Company had neither commenced a program of actual construction nor entered into a binding agreement to undertake such a program. The district court also found that even if the Company had begun con-

___

[3] The defendants argued before the district court that the Company was entitled to various extensions and grace periods, thereby delaying the deadline to February 10, 2003. While the district court did not decide whether this was correct, it noted that the defendants lost even under the February 10 date. The defendants do not re-argue these extensions on appeal, so the January 3, 2003, deadline is the operative one.

structing the plant, it had lapsed in its construction activity for more than 18 months, thereby invalidating the PSD permit.

On appeal, the defendants assert there are genuine factual disputes that should have prevented the district court from granting summary judgment to Sierra Club. We review the district court's grant of summary judgment de novo and construe all facts in the light most favorable to the defendants. *See Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 755 (7th Cir. 2008).

### 1. No reasonable factfinder could find that the Company had started a timely program of actual construction or engaged in construction activities without an impermissible lapse.

The defendants claim that the Company prevented its 2001 PSD permit from expiring by beginning "a continuous program of actual construction" that included "conducting engineering studies [and] excavation work." We disagree.

The EPA defines "begin actual construction" as:

> [I]n general, <u>initiation of physical on-site construction activities on an emissions unit which are of a permanent nature</u>. Such activities include, but are not limited to, installation of building supports and foundations, laying underground pipework and construction of permanent storage structures. With respect to a change in method of operations, this term refers to those <u>on-site activities other than</u>

<u>preparatory activities</u> which mark the initiation of
the change.

40 C.F.R. § 52.21(b)(11) (emphases added); *see also* 40 C.F.R.
§ 52.21(b)(8) (defining "construction" as "any physical
change or change in the method of operation (including
fabrication, erection, installation, demolition, or modifica-
tion of an emissions unit) that would result in a change
in emissions"). We acknowledge (as the defendants
strenuously argue) that beginning actual construction
might be something slightly different than beginning
a continuous program of physical on-site construction,
as required under 42 U.S.C. § 7479(2)(A)(i). But the Com-
pany did not engage in any kind of permanent construc-
tion activity at all. As of the PSD permit's expiration date
of January 3, 2003, the Company had laid no foundation
and constructed no building supports, underground
pipework, or permanent storage structures. Importantly,
the Company had not begun constructing the CFB boilers,
which was something that the PSD permit had explicitly
required that the Company do before January 3. Indeed,
the only construction activity performed by the
Company was that it had directed Alberici Constructors
to dig a hole, which Alberici began to do on January 8.
Alberici's minimal work hardly heralded the start of a
"continuous program" of actual construction, as Alberici
stopped digging the hole on February 14, 2003, after a
payment dispute. And digging the hole was not construc-
tion activity "of a permanent nature," as the Company's
landlord later had the hole refilled.

Our conclusion here is further buttressed by a July 1,
1978, memorandum sent by Edward E. Reich, Director of

Stationary Source Enforcement at the EPA, and entitled "'Commence Construction' Under PSD" (the "Reich Memorandum").[4] In addressing what constitutes physical on-site construction, the Reich Memorandum specifically notes that "[a]ctivities such as site clearing and excavation work will generally not satisfy the commence construction requirements." Reich Memorandum ("As stated in the preamble to the draft regulations, 'it will not suffice merely to have begun erection of auxiliary buildings or construction sheds unless there is clear evidence (through contracts or otherwise) that construction of the entire facility will definitely go forward in a continuous manner'."). The defendants have provided no reason why we should ignore the EPA's guidance on this issue or why this case is a special one that merits ignoring this general rule.

Finally, we note that even if the Company had "commenced construction" of the plant, it lapsed in construc-

_____

[4] While the EPA did not promulgate the Reich Memorandum as part of its rulemaking authority, an "agency's interpretation [of its own regulations] must be given controlling weight unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994) (internal quotation marks omitted). Indeed, "it can still be apparent from the agency's generally conferred authority and other statutory circumstances that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in the statute or fills a space in the enacted law, even one about which 'Congress did not actually have an intent' as to a particular result." *United States v. Mead Corp.*, 533 U.S. 218, 229 (2001) (quoting *Chevron, USA, Inc. v. NRDC, Inc.*, 467 U.S. 837, 845 (1984)).

tion for over 18 months, thereby invalidating its PSD permit. After Alberici stopped digging on February 14, 2003, it performed no more excavation work at the site. Indeed, the site appears to have lain dormant for over 19 months until September 29, 2004, when another company began digging a second hole for the Company. This 19-month lapse in construction activity killed the Company's PSD permit. *See* 40 C.F.R. §§ 52.21(r)(2), 124.5(g)(2).

**2.  No reasonable factfinder could find that the Company had timely entered a binding contract to undertake a program of actual construction.**

The defendants alternatively claim that the Company had "commenced construction" within 18 months of the permit's issuance by signing a "construction memorandum" with B&V in late 2002, thereby requiring those parties to "work together on an exclusive basis . . . in order to draft and negotiate the EPC [Engineering, Procurement and Construction] Contract." To count as a contract that commenced construction, the construction memorandum would have to be one "which [could not] be canceled or modified without substantial loss to the owner or operator, to undertake a program of construction of the facility to be completed within a reasonable time." 42 U.S.C. § 7479(2)(A)(ii).

Even if entering the construction memorandum counted as "commencing construction" of the power plant, the Company's permit expired because of the 19-month lapse between February 2003 and September 2004 in which the Company did no construction work on the

facility. *See supra* II(C)(1). The Company would have to argue (which it doesn't) that the construction memorandum somehow prevented this 19-month lapse from killing the permit. But such an interpretation would in effect allow a PSD permittee to trump the 18-month lapse provision and indefinitely delay the construction of a facility so long as the permittee has entered a contract that "commences construction." We see no basis for reading the EPA regulations in this manner. *See* 40 C.F.R. § 52.21(r)(2) (noting that a PSD permit expires "if construction is discontinued for a period of 18 months or more" or "if construction is not completed within a reasonable time"); *see also* 40 C.F.R. § 52.21(b)(8); Reich Memorandum ("In order to assure that construction proceeds in a continuous manner and is completed within a reasonable time, the regulations require that a break in construction of greater than 18 months or failure to commence construction within 18 months of PSD permit issuance will generally invalidate a source's PSD permit.").

At any rate (as we discuss below), the Company's signing of the construction memorandum did not "commence construction" of the power plant. Before we interpret the memorandum, however, we note that the parties disagree on which jurisdiction's law we should apply. Sierra Club claims we should follow a choice of law provision in the construction memorandum, which specifies that the agreement is to be interpreted "in accordance with the substantive law of the State of New York, except for its choice of laws provisions." *See Am. Fuel Corp. v. Utah Energy Dev. Co., Inc.*, 122 F.3d 130, 134 (2d Cir. 1997) ("[W]here the parties have agreed to the applica-

tion of the forum law, their consent concludes the choice of law inquiry."). The defendants counter that an Illinois statute renders the memorandum's choice of law provision void and points us to Illinois law: *See* 815 Ill. Comp. Stat. Ann. 665/10 (2008) ("A provision contained in or executed in connection with a building and construction contract to be performed in Illinois that makes the contract subject to the laws of another state . . . is against public policy. Such a provision is void and unenforceable.").

We need not decide who is right because both New York and Illinois law[5] would characterize the construction memorandum as a preliminary agreement that required

---

[5] The defendants suggest that a "third alternative" would be to apply federal common law in interpreting the contract, but they don't explain why that alternative should apply here. The two primary cases they cite involved contracts in which the federal government was a party. *See United States v. Seckinger*, 397 U.S. 203, 209-10 (1970) ("[F]ederal law controls the interpretation of [a] contract . . . entered into pursuant to authority conferred by federal statute and, ultimately, by the Constitution."); *Funeral Fin. Sys. v. United States*, 234 F.3d 1015, 1018 (7th Cir. 2000) ("Interpreting the meaning of a provision in a federal government contract is a matter of federal common law . . . ."). That's a materially different situation from what we have here. The defendants also note that federal common law can be applied when "necessary to protect uniquely federal interests," but they don't explain why such federal interests are present here, or why we should disregard both the contracting parties' choice of law (New York law) and the preference indicated by the Illinois statute (Illinois law), particularly when both point to the same outcome.

the parties to conduct further negotiations, not a construction contract to build a power plant. New York law recognizes that parties can enter into precisely this kind of preliminary agreement:

> The parties agree on certain major terms, but leave other terms open for further negotiation. . . . [This type of agreement] 'does not commit the parties to their ultimate contractual objective but rather to the obligation to negotiate the open issues in good faith in an attempt to reach the . . . objective within the agreed framework.' A party to such a binding preliminary commitment has no right to demand performance of the transaction.

*Adjustrite Sys. v. GAB Bus. Servs.*, 145 F.3d 543, 548 (2d Cir. 1998) (quoting *Teachers Ins. & Annuity Assoc. of Am. v. Tribune Co.*, 670 F. Supp. 491, 498 (S.D.N.Y. 1987)). Similarly, "Illinois law recognizes the prerogative to agree to further negotiations, even after most essential contract terms have been settled, while remaining free to back out of a pending deal until the occurrence of some later event." *Venture Assoc. Corp. v. Zenith Data Systems Corp.*, 987 F.2d 429, 432 (7th Cir. 1993).

Here, the construction memorandum was merely a preliminary step toward the parties' ultimate goal—agreeing on an EPC contract for building the power plant. Contrary to the defendants' claim that the memorandum required the parties to "undertake a program of construction of the facility," the memorandum only required the parties to work together toward reaching an actual construction agreement. The memorandum specified that

the parties would "agree to work with each other in good faith . . . to complete the drafting and negotiation of the EPC CONTRACT, with the goal of agreeing and signing such EPC CONTRACT by September 1, 2005." The memorandum was clear that it did not enable the Company to demand that B&V perform construction work: "The PARTIES agree that upon Termination of the CONSTRUCTION MEMORANDUM, CONTRACTOR shall have no liability to perform the EPC Work Scope for the FCP [Franklin County Power] PROJECT for the OWNER." Moreover, the memorandum was hardly a final agreement for building the plant as it noted that B&V was "continuing to develop a firm price and Draft EPC Contract" for the project.

The construction memorandum also listed various events that could terminate the agreement, but none of these events was anything like "completing construction of the plant" or "finishing the construction project," which would have suggested that the construction memorandum was <u>the</u> contract for building the plant. Rather, the terminating events included "[t]he date of signature of the EPC CONTRACT for the FCP PROJECT" and the "[f]ailure of the PARTIES to reach agreement on an EPC Contract by September 1, 2005 or such later date as may be agreed in writing by the PARTIES," which again indicate that the construction memorandum was just a preliminary agreement en route to an EPC contract.

Even if the language of the construction memorandum was unclear, extrinsic evidence (which the defendants encourage us to utilize) would support the same conclu-

sion. As of January 2006, after the construction memorandum had expired, the parties still had not agreed on a price term—while the term sheet contemplates a price of $615 million for the EPC contract, B&V advised the Company on January 10, 2006, that the project would be in the "$710m plus range." B&V also told the Company that the project would require 45 months or more to completion, not the Company's target of 32 months, and advised the latter, "If you can find someone competent who will do the project for $615m and 32 months you must go ahead and work with them." These facts indicate that the construction memorandum was not a contract to build the actual plant.

The defendants also claim that the construction memorandum's $72 million termination fee (which they represented at oral argument that they would have to pay if they lost this suit) indicates that this was a contract to construct the power plant. This fee appears to be less than 10% of the total project cost, which was estimated by the defendants at oral argument to be between $750 million and $1 billion. *See* Reich Memorandum ("A Contractual obligation for purposes of commencing construction must also be one which cannot be cancelled or modified without substantial loss. . . . Whether a loss of less than or equal to 10% of the total project cost will be considered substantial will be determined on a case by case basis.").

At any rate, the existence of this fee doesn't affect our conclusion that the memorandum is just a preliminary agreement requiring the parties to conduct further nego-

tiations. *Cf. id.* ("[C]ontracts for non site specific equip-
ment, such as boilers, will typically not suffice, regardless
of any penalty clauses contained in the contracts."). Indeed,
we have previously noted that parties often include these
kinds of termination fees in preliminary agreements:

> The process of negotiating multimillion dollar
> transactions . . . often is costly and time-consum-
> ing. The parties may want assurance that their
> investments in time and money and effort will not
> be wiped out by the other party's footdragging or
> change of heart or taking advantage of a vulnerable
> position created by the negotiation. . . . [T]hey
> might prefer to create [a contractual remedy] in the
> form of a deposit or drop fee (what in publishing is
> called a "kill fee"), rather than rely on a vague duty
> to bargain in good faith. . . .
>
> Damages for breach of an agreement to negotiate
> may be, although they are unlikely to be, the same
> as the damages for breach of the final contract that
> the parties would have signed. . . .

*Venture Assocs. Corp. v. Zenith Data Systems Corp.*, 96 F.3d
275, 278 (7th Cir. 1996) (internal citations omitted). So the
presence of this fee does not imply that the construction
memorandum was a contract to build the power plant.

Finally, the defendants contend that the use of the
word "program" in "program of construction" suggests
that we should interpret more broadly which construction
contracts count as "commencing construction" and not
limit ourselves to contracts for actual construction of a

facility. We are not so sure. *Cf. Sierra Pac. Power Co. v. EPA*, 647 F.2d 60, 67 (9th Cir. 1981) (citing *United States v. City of Painesville*, 431 F.Supp. 496, 500 n.5 (N.D. Ohio 1977), *aff'd*, 644 F.2d 1186 (6th Cir. 1981)) (approving the EPA's decision not to read the word "program" broadly to include planning and design of a unit). But at any rate, the construction memorandum was not a contract for a "program" of construction activity. As the Reich Memorandum notes, "In order to satisfy the commence construction requirements, a contractual obligation must be for a site specific commitment. The types of activities which will be considered site specific for purposes of a contract are identified in question #1 ['placement, assembly, or installation of materials, equipment, or facilities which will make up part of the ultimate structure of the source']." Here, the construction memorandum did not require B&V to do any site-specific construction (or even any nonsite-specific construction). It was, to reiterate, just a contract that required the parties to work toward an EPC agreement. And the Reich Memorandum indicates that entering this kind of contract is simply not enough to "commence construction."

This conclusion makes sense. Time limits prevent companies from sitting on PSD permits for an unreasonably long period of time. Presumably these requirements help ensure that major emitting facilities comply with up-to-date emissions regulations and do not construct today's facilities with yesterday's technology. Reading the phrase "program of construction" so broadly as to encompass the construction memorandum would greatly extend the time that companies could delay the actual

construction process. We decline to adopt that interpretation here.

**D. The district court did not err in granting injunctive relief in favor of Sierra Club.**

The defendants also challenge on two grounds the district court's decision to grant injunctive relief in favor of Sierra Club. First, the defendants claim the district court lacked jurisdiction to grant an injunction because, according to them, a civil penalty is the sole remedy for the citizen suit here. The defendants rely on language at the end of 42 U.S.C. § 7604(a) (emphases added):

> The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an emission standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties (except for actions under paragraph (2)).

The defendants claim the first two remedies emphasized above correlate with sections 42 U.S.C. §§ 7604(a)(1) and (a)(2), respectively, and the third remedy (*i.e.*, "civil penalties") applies to 42 U.S.C. § 7604(a)(3), the provision at issue in this citizen suit. Specifically, the defendants contend that the district court could only award civil penalties and not an injunction as a remedy for Sierra Club's section 7604(a)(3) suit here.

The defendants' argument lacks merit. The statute does not state that the three remedies listed above are exclu-

sively available for suits that are brought under their "corresponding" statutory subsections. In fact, the statute suggests just the opposite when it states that the third remedy ("any appropriate civil penalties") is not available for "actions under paragraph (2) [section 7604(a)(2)]," which implies that this remedy is available for actions under sections 7604(a)(1) and 7604(a)(3).

Moreover, the defendants have not cited (and we have not found) any case law that has interpreted the provision in the manner that they propose. Sierra Club, on the other hand, can point to at least one case that directly contradicts the defendants' position. *See United States v. Am. Elec. Power Serv. Corp.*, 137 F. Supp. 2d 1060, 1067 (S.D. Ohio 2001). Although this district court case is not binding on us, we agree that "a plain reading of the statute" implies "that the [injunctive remedies provision] applies to actions under [section 7604](a)(3)." *Id.*

The defendants also claim the district court erred by not performing the standard four-part analysis that precedes an award of injunctive relief. That analysis generally requires a court to consider (1) whether the plaintiff has suffered or will suffer irreparable injury, (2) whether there are inadequate remedies available at law to compensate for the injury, (3) the balance of hardships, and (4) the public interest. *eBay Inc. v. MercExchange, L.L.C.*, 126 S. Ct. 1837, 1839 (2006); *e360 Insight v. The Spamhaus Project*, 500 F.3d 594, 604 (7th Cir. 2007). We review the district court's entry of such an injunction for an abuse of discretion. *e360*, 500 F.3d at 603.

Circuit courts have upheld orders granting injunctive relief where a district court did not perform a complete

four-part analysis when a plaintiff prevailed on the merits of his claim, *see Fogie v. THORN Americas, Inc.*, 95 F.3d 645, 654 (8th Cir. 1996), or when, in an action for a statutory injunction, a violation was demonstrated and there was a reasonable likelihood of future violations, *see United States v. Kaun*, 827 F.2d 1144, 1148 (7th Cir. 1987). Moreover, "[i]t is an accepted equitable principle that a court does not have to balance the equities in a case where the defendant's conduct has been willful." *EPA v. Envtl. Waste Control*, 917 F.2d 327, 332 (7th Cir. 1990).

Sierra Club latches on to this last exception, claiming that the Company has engaged in willful misconduct by persisting in its "proposal to construct this Project without a valid permit." But Sierra Club cites no authority to explain how the Company's persistence constitutes willful misconduct. The Company need not roll over and concede that its permit is invalid—indeed, that's what this litigation is all about. Unlike cases in which defendants flaunted environmental laws by, for example, not implementing control systems for hazardous wastes, *see United States v. Bethlehem Steel Corp.*, 38 F.3d 862, 865, 867-68 (7th Cir. 1994), the Company here is simply defending the validity of its permit in court. And the Company's arguments are not so frivolous as to make us believe that its defense is akin to some kind of malicious intransigence.

Still, we need not remand this case for the district court to explicitly analyze the injunctive relief factors. The court found that the Company did not have a valid PSD permit when it granted Sierra Club's motion for summary judg-

ment. Because EPA regulations require the Company to obtain such a permit before it can build the facility, 42 U.S.C. § 7475(a)(1), the court's decision leaves the Company no option but to obtain this permit before it can commence construction. So the court's injunction, which prohibits the Company from "actual construction of the Plant until [it has] obtained a valid PSD permit," is essentially the same as the court's finding on the merits. *See Fogie*, 95 F.3d at 654 (holding that by prevailing on the merits of its claim, "the plaintiff class has demonstrated that the four factors of this test overwhelmingly militate in favor of an injunction").

Moreover, this is not a case where a plaintiff sued an already-operational facility and claimed it was polluting in excess of permissible limits. In such a situation, a district court would likely need to balance equities before it granted injunctive relief and shut down the facility. *See Harrison v. Indiana Auto Shredders Co.*, 528 F.2d 1107, 1123 (7th Cir. 1975). Here, the only cost to the Company of the injunction is that it must now obtain a new permit before it can build, which was already implicit in the court's decision granting summary judgment.

Additionally, the record here demonstrates that the four injunctive relief factors favor Sierra Club. First, Sierra Club will likely suffer irreparable injury if the Company builds under its expired PSD permit rather than a new permit because the former likely includes more relaxed emission standards. *See supra* section II(A)(3); *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) (environmental injuries are "often permanent or at least of long dura-

tion, *i.e.*, irreparable"). Second, legal remedies will not adequately address Sierra Club's injury. The record shows that at least one Sierra Club member will likely suffer a decrease in recreational and aesthetic enjoyment of Rend Lake if the plant is built according to the 2001 permit. An economic award would not sufficiently compensate for this injury. *See Amoco*, 480 U.S. at 545 ("Environmental injury, by its nature, can seldom be adequately remedied by money damages . . . ."); *Envtl. Waste Control*, 917 F.2d at 332.

Third, the balance of harms favors issuing an injunction. An injunction protects Sierra Club from irreparable injury while simply requiring the Company to defer construction until it obtains a permit that complies with the Clean Air Act. Finally, the record contains no evidence that the injunction harms the public interest. In fact, based on the record before us, we agree with Sierra Club that requiring the Company to obtain a valid PSD permit would likely result in decreased emissions and improved public health, which would further a stated goal of the Clean Air Act. *See* 42 U.S.C. § 7401(b)(1) ("to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population").

Although in most instances we would remand a case when a district court did not clearly explain why it granted injunctive relief, *see e360*, 500 F.3d at 604, we need not remand here because the court's decision on the merits essentially embraced the remedy and the injunctive relief factors favor Sierra Club. A remand on this issue would merely prolong the case, result in additional

costs, and not change the outcome. *Cf. Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996); *DiLeo v. Ernst & Young*, 901 F.2d 624, 626 (7th Cir. 1990).

## III.  CONCLUSION

The judgment of the district court is AFFIRMED.