# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2613

_____

Hempstead County Hunting Club, Inc.   *
                                      *
            Appellant,                *
                                      *   Appeal from the United States
       v.                             *   District Court for the
                                      *   Western District of Arkansas.
Southwestern Electric Power           *
Company,                              *        [PUBLISHED]
                                      *
            Appellee.                 *

_____

Submitted: March 05, 2009
Filed: March 12, 2009

_____

Before SMITH, GRUENDER, and BENTON, Circuit Judges.

_____

PER CURIAM.

Hempstead County Hunting Club (HCHC) filed a citizen's suit against Southwestern Electric Power Company (SWEPCO) pursuant to the Clean Air Act (CAA), 42 U.S.C. §§ 7401–7671, seeking a preliminary and permanent injunction to prevent SWEPCO from commencing construction, constructing, or continuing construction of its 600-megawatt pulverized coal-fired power plant in Hempstead County, Arkansas, without first obtaining a Prevention of Significant Deterioration

(PSD) permit as required by the CAA.[1] On the same day that it filed its complaint, HCHC filed a motion for temporary restraining order and preliminary injunction. The district court[2] denied the motion, and HCHC filed an interlocutory appeal, pursuant to 28 U.S.C. § 1292(a)(1), arguing that the district court abused its discretion in denying the preliminary injunction because "SWEPCO has proposed to construct and is constructing its Hempstead Plant, although it does not have a CAA permit."

SWEPCO has filed a motion to dismiss this appeal, arguing that the appeal is moot because it has now received the CAA permit and has lawfully begun construction at the site, rendering HCHC's appeal of the denial of its motion for a preliminary injunction to halt preconstruction activities moot. We agree and now dismiss the appeal as moot.

## I. *Background*

HCHC is an Arkansas nonprofit corporation incorporated for recreational purposes and to preserve the club's over 4000 acres of real property in Hempstead County, Arkansas. HCHC's property includes a 2315 acre marshy body of water known as Grassy Lake, which forms the floor of an ancient Bald Cypress forest. Grassy Lake is home to a wide variety of wildlife, including alligators and approximately 128 bird species. The members of HCHC partake in duck, deer, and turkey hunting, bird watching, alligator spotting, fishing, and various other activities involving local and migratory wildlife.

---

[1]Although not relevant to this interlocutory appeal, HCHC also sought declaratory relief concerning SWEPCO's violations of the CAA, along with civil penalties for those violations.

[2]The Honorable Harry F. Barnes, United States District Judge for the Western District of Arkansas.

SWEPCO is a general electric utility business that generates, transmits, distributes, and sells electric power and energy to customers in its service area. It is a public utility within the meaning of Arkansas Code Annotated § 23-1-101, meaning that it is subject to the jurisdiction of the Arkansas Public Service Commission ("the Commission").

On December 8, 2006, SWEPCO filed with the Commission an Application for a Certificate of Environmental Compatibility and Public Need ("Certificate") to construct a 600-megawatt pulverized coal-fired power plant ("Turk Plant") in Hempstead County, Arkansas. In January 2007, HCHC and others owning property adjacent to or in the general proximity of SWEPCO's proposed plant site were allowed to intervene in the proceeding before the Commission. On November 21, 2007, after receiving public and agency comments and conducting a public hearing on the application, the Commission granted SWEPCO a Certificate in connection with the Turk Plant. HCHC has appealed the Commission's decision to grant the Certificate to the Arkansas Court of Appeals.

The Certificate issued to SWEPCO is subject to various conditions, including the condition that SWEPCO obtain and comply with all necessary permits required by the United States Environmental Protection Agency (EPA) and the Arkansas Department of Environmental Quality (ADEQ). At the time that the instant litigation was commenced, SWEPCO was in the process of obtaining a PSD permit, as required by the CAA, 42 U.S.C. § 7475(a), and EPA and ADEQ regulations. On June 12, 2007, ADEQ issued a draft PSD permit for the Turk Plant. Thereafter, HCHC submitted written comments to ADEQ and participated in a public hearing regarding the draft permit.

In May 2007, SWEPCO began site preparation work at the proposed site of the Turk Plant. This work included the following: site clearing; grading and site leveling; installing a detention pond for surface water runoff control; installing construction

trailers, office trailers, break trailers, and porta-potties; installing parking lots, storage and laydown areas for construction equipment and construction materials; installing utilities (telephone lines, computer lines, electrical, sanitary and potable water) to construction facilities; ordering, mobilizing and storing construction equipment on site; ordering, mobilizing and storing construction materials on site; installing access roads to and on site; and installing temporary security fencing on site.

On May 9, 2008, HCHC filed this citizen's suit against SWEPCO pursuant to 42 U.S.C. § 7604(a)(3). In its complaint, HCHC alleged that SWEPCO had begun actual construction of the proposed Turk Plant without first obtaining a valid PSD permit as required by the CAA. HCHC asked the district court to enjoin SWEPCO from further construction on the proposed plant site until such time as a PSD permit had been obtained from the ADEQ. In response, SWEPCO asserted that it had not begun actual construction of the Turk Plant. Rather, it contended that it was engaging in site preparatory work that is allowed by EPA and ADEQ regulations, along with the EPA's guidance memorandums interpreting the PSD requirements.

After conducting a hearing on HCHC's motion for a preliminary injunction, the district court issued an order denying the preliminary injunction on July 10, 2008. At the time of the district court's judgment, the ADEQ had not yet issued a final permit to SWEPCO. HCHC timely filed a Notice of Appeal on July 17, 2008.

On November 5, 2008, the ADEQ issued SWEPCO the PSD permit. Acting pursuant to the EPA's approval of its state PSD program, the ADEQ has now permitted SWEPCO to construct and operate the Turk Plant. But in early December 2008, HCHC and others filed requests for an adjudicatory hearing on the Turk Plant PSD permit. All challenges were consolidated into a proceeding before an administrative law judge (ALJ) with the Arkansas Pollution and Ecology Commission (APC&EC). The ALJ has not yet held a hearing on the merits of the permit challenges.

-4-

Under Arkansas Code Annotated § 8-4-205(c)(6), the issuance, modification, or revocation of a permit by the ADEQ that is subject to an adjudicatory appeal is automatically stayed. But this provision permits the APC&EC to grant an application by a party to modify or terminate the otherwise automatic stay "under appropriate circumstances to avoid substantial prejudice to any party." Ark. Code Ann. § 8-4-205(c)(6)(C). SWEPCO invoked this provision, filing a motion for partial relief from automatic stay to avoid substantial job losses and to allow SWEPCO to continue constructing, but not operating, the facility. HCHC opposed SWEPCO's request. After a hearing on December 5, 2008, the APC&EC granted SWEPCO's motion and modified the automatic stay to the extent that it would have otherwise precluded SWEPCO from proceeding with the construction activities at the site. Construction of the Turk Plant is now underway in Hempstead County, Arkansas.

## II. *Discussion*

In its motion to dismiss the appeal as moot, SWEPCO asserts that it has now received the PSD permit under the CAA and has lawfully begun construction at the site, rendering moot HCHC's appeal of the denial of its motion for a preliminary injunction to halt preconstruction activities.

In response, HCHC argues that the appeal should not be dismissed for two reasons. First, HCHC maintains that CAA § 304(a)(3) authorizes a citizen's suit when a person proposes to construct or constructs a CAA facility without a valid permit under the CAA. According to HCHC, § 304(a)(3) claims are viable even in relation to already-issued permits if the permits are the subject of administrative or legal challenges testing their validity. Thus, HCHC asserts that a live case and controversy exists because SWEPCO's permit is the subject of an administrative and legal challenge testing whether SWEPCO has proposed to construct and is constructing the Hempstead Plant without a valid permit.

-5-

Second, HCHC argues that, in interlocutory appeals regarding requests for preliminary injunctive relief, well-established doctrine encourages appellate courts to resolve the underlying merits of a case if legal and factual issues were sufficiently "illuminated" in the proceedings before a district court and if doing so serves judicial economy. HCHC maintains that the relevant legal and factual issues were sufficiently and exhaustively "illuminated" and presented in the district court and that the parties will incur undue expense and burden if this matter is remanded. HCHC thus seeks to avoid reargument of these substantive issues to the district court on remand. As a result, HCHC contends that, even assuming there is no longer a case or controversy regarding HCHC's request for preliminary relief, the court should resolve the underlying merits of HCHC's claim before remanding the matter to the district court.

"Federal courts are courts of limited jurisdiction and can only hear actual 'cases or controversies' as defined under Article III of the Constitution. The 'case or controversy' requirement applies at all stages of review." *Neighborhood Transp. Network, Inc. v. Pena*, 42 F.3d 1169, 1172 (8th Cir. 1994). A federal court no longer has jurisdiction to hear a case on appeal when it "no longer presents an actual, ongoing case or controversy." *Id.* (holding that complaint seeking to enjoin highway construction project pending completion of environmental impact statement for larger project no longer presented any live controversy after highway project was completed and, thus, was moot and provided no basis for federal court jurisdiction); *see also Agrigenetics, Inc. v. Rose*, 62 F.3d 268, 270 (8th Cir. 1995) (holding that question of whether former employer was entitled to preliminary injunction ordering former employees to comply with noncompetition provisions of employment agreements was moot, since the noncompetition restriction expired by time of appeal).

"A claim for injunctive relief may become moot if challenged conduct permanently ceases." *Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 354 (8th Cir. 1998). "When the alleged violation underlying a Clean Water Act [CWA] citizen suit ceases while the suit is pending, longstanding principles of

mootness prevent the maintenance of suit when there is no reasonable expectation that the wrong will be repeated." *Id.* (internal quotations, alterations, and citation omitted). As with the CWA, these same principles apply to a citizen's suit pursuant to the CAA. *See Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 477–78 (1990) ("This case-or-controversy requirement subsists through all stages of federal judicial proceedings, trial and appellate. To sustain our jurisdiction in the present case, it is not enough that a dispute was very much alive when suit was filed, or when review was obtained in the Court of Appeals. The parties must continue to have a personal stake in the outcome of the lawsuit.") (internal quotations and citations omitted).

We have previously addressed the issue of mootness in relation to a CWA citizen's suit. In *Mississippi River Revival, Inc. v. City of Minneapolis*, 319 F.3d 1013, 1014 (8th Cir. 2003), three environmental organizations brought citizens' suits against the Cities of Minneapolis and St. Paul (collectively "Cities"), "alleging that the Cities were violating the [CWA] by discharging storm waters through their storm sewer systems without required [National Pollutant Discharge Elimination System (NPDES)] permits." The district court had dismissed the complaints as moot after the Minnesota Pollution Control Agency (MPCA) issued storm water permits. *Id*. On appeal, we pointed out that the CWA violations alleged in the environmental organizations' complaints "were the Cities' continuing discharge of storm waters *without NPDES Storm water permits*." *Id*. at 1015 (emphasis added). Relevant to the present appeal, we also noted that "*[b]ecause permits have now issued*, plaintiffs concede that their initial claims for injunctive and declaratory relief are moot." *Id*. (emphasis added). Thus, the only issue before the court was whether the environmental organizations' claims for civil penalties were moot. *Id*. We ultimately held that the claims for civil penalties were mooted by the MPCA's issuance of NPDES permits. *Id*. at 1017–18 (holding that the remedies available to the environmental organizations were limited to those that would redress ongoing and future injury, and there was no evidence that discharges without permit would resume).

Similarly, this court has held that a lake association's CWA claim for injunctive relief against contracting companies became moot when the companies' NPDES permit terminated and the MPCA approved a stipulated agreement requiring the companies to pay penalties for past permit violations. *Comfort Lake*, 138 F.3d at 355. In *Comfort Lake*, the MPCA issued the companies an NPDES permit, which "required erosion and sediment control facilities because of run-off to pollutants from the construction site threatened the water quality of [a nearby lake]." *Id*. at 353. After investigating complaints, the MPCA sent the companies a warning letter, noting permit violations. *Id*. The companies responded, asserting that they had properly addressed the problems. *Id*. Thereafter, a lake association issued a notice of intent to sue the companies over the same NPDES permit violations noted in the MPCA's warning letter. *Id*. at 353–54. The association then filed a citizen's suit. *Id.* at 354. Two months before the lake association filed suit, the MPCA again "inspected the construction site, found continuing violations, and issued a Notice of Violation to [the companies]." *Id*. Ultimately, the companies corrected the deficiencies, and the MPCA issued a memorandum stating that the violations had been corrected. *Id*. The companies completed construction and applied for termination of the NPDES permit, which the MPCA terminated. *Id*. The MPCA also issued a stipulated agreement requiring the companies to pay civil penalties for past violations of the permit; the agreement recited that it covered all alleged permit violations that occurred at the construction site and that such violations had been satisfactorily resolved. *Id*. Thereafter, the companies then moved for summary judgment in the lake association's citizen's suit, which the district court granted. *Id*.

On appeal, the issue before this court was whether the lake association's claim for injunctive relief was moot. *Id*. The lake association argued, inter alia, "that permit termination did not moot its claim for injunctive relief because [the companies] constructed three settling ponds that are discharging pollutants into [the lake] without an NPDES permit, and because [the companies] are likely to violate their umbrella

NPDES permit at other construction sites." *Id*. at 355. This court rejected the lake association's argument, stating:

> The answer to this contention is that *these issues are not proper subjects of the lawsuit* because Comfort Lake's notice of intent to sue *referenced only the alleged permit violations discussed in MPCA's December 20, 1994, warning letter*, violations relating to the Wal-Mart store construction. A citizen suit is limited to violations that are closely related to and of the same type as the violations specified in the notice of intent to sue.

*Id*. (emphasis added); *see also Envtl. Conservation Org. v. City of Dallas*, 529 F.3d 519, 526, 529–31 (5th Cir. 2008) (recognizing that "developments subsequent to the filing of a citizen suit may moot the citizen's case" and holding that environmental organization's claims for injunctive relief in CWA citizen enforcement action alleging that City of Dallas failed to develop and implement effective program to monitor and reduce its discharge of storm water pollutants into river were mooted by resolution of EPA's enforcement action).

HCHC heavily relies on *Sierra Club v. Franklin County Power of Illinois*, 546 F.3d 918 (7th Cir. 2008), in support of its argument that a live case and controversy still exists. In *Sierra Club*, a power company wanted to build a coal power plant. *Id*. at 922. Because the plant would emit a large amount of air pollution, the company had to first obtain a PSD permit from the Illinois Environmental Protection Agency (IEPA). *Id*. The Sierra Club sought to enjoin the company from building the power plant by bringing a citizen's suit under the CAA, alleging that the company's 2001 PSD permit had expired because the company had neglected to "commence construction" of the plant within an 18-month time frame required under the permit. *Id*. It also claimed that the permit was invalid under EPA regulations because the company had discontinued construction of the plant for over 18 months. *Id*. The district court permanently enjoined the company from building the plant until it

obtained a new PSD permit, and the company appealed, asserting that the permit remained valid. *Id*.

On appeal, the company argued, inter alia, that Sierra Club's claim was not ripe and permissible under 42 U.S.C. § 7604(a)(3). *Id*. at 928. Section 7604(a)(3) permits a person to commence a civil action "against any person . . . who is alleged . . . to be in violation of any condition of [a PSD] permit." *Id*. The court rejected the company's argument that the Sierra Club must wait until the company actually began constructing the plant before the Sierra Club could allege that the company had violated its preconstruction PSD permit because "it does not logically follow . . . that a preconstruction permit violation cannot occur until actual construction begins." *Id.*

The company also argued that § 7604(a)(3) only allows suits against entities that are "without a permit," meaning that the Sierra Club could not bring the suit because the company received a permit—"albeit one that may no longer be valid." *Id*. The company asserted that the matter was not ripe for adjudication until the IEPA issued a final decision on whether the company's 2001 permit had expired. *Id*. The court rejected this argument, finding that it ignored the explicit language of § 7604(a)(3) because the company is "a person alleged to be in violation of a PSD permit." *Id*. "Moreover, even if having an expired permit were akin to having no permit at all, [the court found that the] Sierra Club would still be able to sue under section 7604(a)(3), which enables citizens to sue entities like the Company that *propose[ ] to construct* . . . new or modified major emitting facilit[ies] without a [PSD] permit.'" *Id*. at 928–29 (quoting 42 U.S.C. § 7604(a)(3)) (emphasis added in *Sierra Club*). The court concluded that it was "irrelevant that the IEPA has yet to finish deciding whether the Company's permit is invalid because that's not what section 7604(a)(3) requires." *Id*. at 929. According to the court, a district court has jurisdiction over a citizen's suit that challenges "the validity of a permit even though [the relevant agency] ha[s] not yet acted to revoke the permit." *Id*. The court rejected a "categorical rule requiring a plaintiff to wait until the relevant agency finishes

-10-

deciding whether a permit is valid (at least when, as here a suit is not asking us to review an agency action)" and found that the "Sierra Club ha[d] properly brought this suit under [§ 7604(a)(3)]." *Id.*

Here, HCHC's request for preliminary injunctive relief—the only issue in this interlocutory appeal—is based on its argument that "SWEPCO has proposed to construct and is constructing its Hempstead Plant, although *it does not have* a CAA permit." In support of its argument, HCHC cites § 7604(a)(3), which authorizes a citizen's suit when "any person who proposes to construct or constructs any [CAA] facility without the required permit." Thus, HCHC's allegation that SWEPCO is acting illegally rests on its argument that SWEPCO is engaging in construction activities *without a permit*. Therefore, the present case is comparable to *Mississippi River Revival* in which, after the MPCA issued storm permits, the district court dismissed the environmental organizations' complaints as moot, as the complaints were based on the allegation that the Cities were discharging storm waters *without required permits*.

Likewise, as in *Comfort Lake*, HCHC's argument that the appeal is not moot because it may challenge an issued permit as "invalid" is "not [the] proper subject[] of the lawsuit" because HCHC's complaint referenced only SWEPCO's construction of the Turk Plant without first obtaining a permit. *Comfort Lake*, 138 F.3d at 355. The district court's consideration of injunctive relief extended only to *preconstruction activities* conducted *before the PSD permit* was issued, and its consideration of the merits extended only to measuring HCHC's likelihood of success on its underlying claim. Because the ADEQ had not issued a permit at the time that the district court issued its decision, no question regarding the *validity* of the subsequently issued Turk Plant PSD permit was properly before the district court. This fact distinguishes the present case from *Sierra Club*. In that case, the issue before the district court was always whether a previously issued permit was "valid." Here, no permit was even

issued at the time that HCHC brought its citizen's suit, so HCHC could not have alleged that an issued permit was "invalid."

## III. *Conclusion*

Accordingly, we grant the appellee's motion to dismiss the instant appeal as moot.

_____